**Judy G. SPICER, Plaintiff/Appellant,**

v.

**BEAMAN BOTTLING COMPANY, Bob Baker, and Don Hollingshead, Defendants/Appellees.**

Supreme Court of Tennessee, at Nashville.

Oct. 28, 1996.

Joyce M. Grimes, Nashville, for Plaintiff/Appellant.

James W. Cameron, III, D. Alexander Fardon, Leilani Boulware Southard, Harwell, Howard, Hyne, Gabbert & Manner, P.C., Nashville, for Defendants/Appellees.

## OPINION

ANDERSON, Justice.

In this appeal, we are asked to determine whether the plaintiff's action under the Tennessee Human Rights Act was timely filed within the one-year statute of limitations. The trial court held that a hostile environment existed which did not end until plaintiff's termination, and that therefore her

claim of sexual harassment was not barred. The Court of Appeals reversed, holding that no act of sexual harassment occurred within the one-year period, and that the alleged retaliatory actions did not extend the statute under the continuing violation exception to the statute of limitations.

Resolution of this case requires an examination of the continuing violation doctrine first developed by the federal courts in their interpretation of analogous federal anti-discrimination legislation. It is an issue of first impression in this jurisdiction.

After a careful review of the relevant case law, we adopt the continuing violation doctrine which allows a plaintiff to challenge an ongoing, continuous series of discriminatory acts in their entirety as long as one of those discriminatory acts falls within the limitations period.

In this case, however, the record establishes that all acts of sexual harassment occurred more than one year before the plaintiff commenced this action. Accordingly, the continuing violation doctrine does not apply and the plaintiff's action is time-barred. The Court of Appeals' judgment is, therefore, affirmed.

## BACKGROUND

Judy G. Spicer was employed as a quality control technician for defendant, Beaman Bottling Company, from July 9, 1990, until her discharge on June 27, 1991. Spicer was responsible for starting a bottling line each morning, monitoring the finished product passing by at a rate of 500 units per minute, controlling the product content, performing a battery of tests on the product about every thirty minutes to ensure compliance with the quality and safety guidelines, and documenting in writing the tests and their results.

Don Hollingshead supervised Spicer, and at some point after her employment, he began to ask her out on dates. She refused to go out with him, and after her first rejection of his advances, Spicer said that Hollingshead asked her out more frequently. On at least one occasion, he grabbed her, told her that he thought she "would kiss good" and that "she would be good." She continued to refuse his advances and advised him that she did not wish to go out with him. He made other sexual comments that embarrassed her and made her feel uncomfortable. Finally, on May 14, 1991, while Spicer was in the window-walled product testing laboratory, Hollingshead grabbed her and pulled her towards him. She asked him to stop, pulled away from him, and walked away.

After this episode, Spicer immediately complained to Tony Kowalski, the production manager at Beaman, who reported the complaint to Bob Baker, Beaman's operations manager. Baker called both Spicer and Hollingshead into his office. Baker testified that Spicer did not complain to him at that time about sexual harassment, but said only that Hollingshead had grabbed her arm, was picky, and did not trust her. Baker harshly reprimanded Hollingshead for grabbing Spicer's arm and advised Spicer that she needed to listen to her supervisor.

Spicer was not satisfied with Baker's response, and after reviewing the sexual harassment policy in her employee handbook, she met the following day with Lonnie Hillis, Beaman's director of personnel. She told Hillis about Hollingshead's frequent requests for dates and his unwelcome touches. At the end of the meeting, Spicer gave Hillis a handwritten statement in which she recounted the acts of sexual harassment by Hollingshead.

Hillis investigated Spicer's complaint and interviewed fourteen co-workers. His investigation showed that Hollingshead had asked Spicer to meet him at a country-western bar to dance; that Hollingshead had grabbed Spicer by the arm or sleeve as she was walking away from him on May 14, 1991; that several employees thought Spicer did not know how to perform her job; and that Hollingshead had allowed Spicer to be away from work and to arrive late or leave early excessively. Although Hillis did not confirm Spicer's claim of sexual harassment, he concluded from the investigation that neither Hollingshead nor Spicer were properly performing their jobs.

Hillis testified that after the investigation, he gave Hollingshead a written warning, placed him on a thirty-day probation, and

advised him that he would be fired if he did not improve his supervisory performance or if he ever touched or suggested dancing to a co-worker again.

Hillis also gave Spicer a written warning for poor job performance, placed her on a thirty-day probation, and assigned her to a different production line for retraining and evaluation.

Spicer testified that following the grabbing incident on May 14, 1991, the sexual harassment ended. She testified that Hollingshead instead became "mad and cold." Spicer's co-workers testified that prior to the incident, Hollingshead had shown Spicer and other female employees preferential treatment by allowing them to leave early or come in late or to be excessively absent. After the incident, however, Spicer, as well as her co-workers, testified that Hollingshead made everyone work harder and strictly enforced Beaman's rules and policies.

Although Spicer previously had never been "written up" during her employment with Beaman, Hollingshead gave her a written warning on June 5, 1991, for failing to wear a baseball cap that was considered part of her uniform. She was also given warnings for being late to work on June 11, 12, 19 and 25, 1991. On the afternoon of June 25, 1991, Hollingshead saw that Spicer was away from her line when she was supposed to be performing product tests. Hollingshead looked for her and had her paged. Eventually, he observed Spicer returning from the employee parking lot, and when he inquired as to where she had been, Spicer said she had gone outside while the line was down to roll up the windows on her car. Spicer, however, had previously told a co-worker that she needed to go to the bank, and another co-worker told Hollingshead that he had seen Spicer driving in the parking lot. Suspicious, Hollingshead checked the windows on Spicer's car and found the driver's side window was down. When confronted, Spicer admitted that not all the required tests had been run on her line. Hollingshead gave Spicer a written warning for violating a company policy by leaving without notifying her supervisor or clocking out.

Hollingshead then reported the incident to Baker, and upon investigation, Baker determined that the production and test reports for Spicer's line showed that her line had run from 2:47 p.m. to 3:40 p.m. without anyone performing the necessary tests on 1,400 cases of soft drink. Baker confronted Spicer, concluded that she was being untruthful about her absence, and after consulting with Hillis and Beaman's general manager, John Cohea, and with their concurrence, Baker terminated Spicer's employment on June 27, 1991.

On June 22, 1992, Spicer filed this action pursuant to the Tennessee Human Rights Act against defendants Don Hollingshead, Bob Baker, and Beaman Bottling, alleging sexual harassment, retaliatory discharge, and intentional infliction of emotional distress. At the close of the proof, summarized above, the Chancellor submitted a special verdict form to the jury, which contained the following questions:

1) Did the Defendant Don Hollingshead sexually harass the Plaintiff?

2) When he discharged the plaintiff, did the Defendant Bob Baker retaliate against the Plaintiff because she complained about or opposed the sexual harassment?

3) If you answered Questions 1 or 2 "Yes," is Beaman Bottling Company liable to the Plaintiff? and

4) If you answered Questions 1 or 2 "Yes," fix the amount of damages to be awarded to the Plaintiff.

Following deliberations, the jury responded to Questions 1 and 3 in the affirmative, reported that it was unable to reach a verdict as to Question 2, which resulted in a mistrial on the claim of retaliatory discharge, and fixed damages in the amount of $50,000 against Hollingshead and Beaman Bottling Company in response to Question 4. The Chancellor entered a judgment on the verdict, and the plaintiff took a voluntary nonsuit as to the retaliatory discharge claim against Baker. Thereafter, the defendants Hollingshead and Beaman Bottling Company appealed the jury's verdict in favor of the plaintiff on her claim of sexual harassment.

On appeal, the Court of Appeals concluded that the last act of sexual harassment oc-

curred on May 14, 1991, more than one year before the plaintiff filed this suit on June 22, 1992. Accordingly, the Court of Appeals held that plaintiff's action was time-barred. In so holding, the Court of Appeals rejected Spicer's claims that Hollingshead's alleged retaliatory actions from May 16, 1991, through June 27, 1991, were sufficient to establish the continuing violation exception to the statute of limitations. The Court of Appeals emphasized that the plaintiff admitted that she violated certain rules and policies of Beaman, and that it was these violations which resulted in the written reprimands she challenged. In addition, the intermediate court observed that Spicer testified that Hollingshead, from May 16, 1991, through June 27, 1991, made everyone work harder and comply with all the rules and policies of Beaman. Therefore, the Court of Appeals concluded "there is no evidence in the record to indicate that plaintiff was singled out in the enforcement of these rules and policies." Finally, the Court of Appeals noted that the plaintiff had not cited, nor had research revealed, any authority to support her claim that alleged retaliatory action within the limitations period extends the time for filing a complaint alleging hostile work environment sexual harassment, all acts of which occurred outside the limitations period. Accordingly, the Court of Appeals reversed the trial court and dismissed the plaintiff's case.

Thereafter, we granted permission to appeal, and for the reasons articulated below, affirm the Court of Appeals' judgment.

### CONTINUING VIOLATION DOCTRINE

■ Under the Tennessee Human Rights Act ("THRA"), it is unlawful for an employer "to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's race, creed, color, religion, sex, age, or national origin." Tenn. Code Ann. § 4–21–401(a)(1) (1991 Repl.). It

is beyond dispute that the THRA applies to claims of employment discrimination on the basis of hostile work environment sexual harassment. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996). To prevail on a claim of hostile work environment sexual harassment, a plaintiff must assert and prove (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcomed sexual harassment; (3) the harassment occurred because of the employee's gender; (4) the harassment affected a "term, condition or privilege" of employment; and (5) the employer knew or should have known of the harassment and failed to respond with prompt and appropriate corrective action.[1] *Id.* We emphasized in *Campbell* that the conduct underlying a hostile work environment claim need not be clearly sexual in nature. *Id.* at 32. The key inquiry is whether an employee of one race or gender is subjected to disadvantageous terms or conditions of employment to which members of another race or gender are not exposed. *Id.*

■ As we analyze this claim under the Tennessee Human Rights Act, we think it appropriate to examine federal case law, as well as state law, since the stated purpose and intent of the Tennessee Act is to provide for execution within Tennessee of the policies embodied in the federal anti-discrimination acts and because there is a 35–year history of case law development since the passage of Title VII of the Civil Rights Act. Tenn.Code Ann. § 4–21–101(a)(1) (1991 Repl.); *Bennett v. Steiner–Liff Iron and Metal Co.*, 826 S.W.2d 119, 121 (Tenn.1992).

■ Statutes of limitations for actions predicated upon employment discrimination are triggered and commence running on the occurrence of the alleged discriminatory act, and not at the time the last effects of the discriminatory act have been manifested. *See Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431

---

**1.** There is disagreement among the federal courts as to whether plaintiffs must prove "respondeat superior" where a plaintiff alleges the actions of a supervisor constituted hostile work environment sexual harassment. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994). In this case, the Court of Appeals, in dicta, stated that plaintiffs are required to prove respondeat superior in supervisor hostile work environment cases. Because we conclude the plaintiff's action is time-barred, we find it unnecessary to reach that issue and reserve decision for a case in which the issue is squarely presented.

(1980); *E.E.O.C. v. Penton Indus. Pub. Co., Inc.*, 851 F.2d 835, 837 (6th Cir.1988).

■■■ The "continuing violation doctrine" was developed by federal courts in the late 1960s in the context of Title VII of the federal Civil Rights Act as an exception to the statute of limitations because initially, the statutory period within which suits had to be filed was very short and as a result, many potential claims were barred. *Bell v. Chesapeake & Ohio Ry. Co.*, 929 F.2d 220, 223 (6th Cir.1991). This doctrine relieves a plaintiff from the burden of proving that the entire violation occurred within the limitations period. To establish a continuing violation, a plaintiff must show a series of related acts, one or more of which falls within the limitations period. *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 979 (5th Cir.1983); *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992).

State courts adopting the continuing violation doctrine enumerate several factors that militate against strict application of the statute of limitations in the context of employment discrimination. *Sumner v. Goodyear Tire & Rubber Co.*, 427 Mich. 505, 398 N.W.2d 368, 377 (1986). First, they emphasize that Title VII is a remedial statute designed to eliminate discrimination and make parties whole. Second, they stress that employees are generally lay people and are unaware that they must act quickly or risk losing their cause of action. Often employees fear reprisal or turn to others for help, and in so doing, delay action on their cause until the statute has expired. Finally, and perhaps most importantly, those courts recognize that many discriminatory acts cannot be viewed as discrete incidents, and often unfold rather than occur, making it difficult to precisely pinpoint the time when they take place. *Id.*

■■■ Although application of the continuing violation doctrine is not always clear and simple,[2] there appears to be near universal agreement as to the abstract legal formulation of the doctrine. After a review of the relevant case law, we find persuasive the rationale supporting the continuing violation doctrine and adopt it in Tennessee.[3] Courts have recognized, however, only two narrowly limited instances in which the continuing violation doctrine applies. The first category arises where there is some evidence of *present* discriminatory activity giving rise to a claim of a continuing violation,[4] for example where an employer continues to presently impose disparate work assignment or pay rates between similarly situated employee groups.[5] Key to establishing this exception is proof that at least one of the forbidden discriminatory acts occurred within the relevant limitations period. *Dixon*, 928 F.2d at 216.

The second category of "continuing violation" arises where there has been a long-standing and demonstrable policy of discrimination such as an established and repeated pattern of paying men more than women. *See, e.g., Janikowski v. Bendix Corp.*, 823 F.2d 945, 948 (6th Cir.1987). To constitute such an established pattern, the plaintiff must clearly demonstrate some "overarching

**2.** *Ferguson v. E.I. duPont de Nemours & Co., Inc.*, 560 F.Supp. 1172, 1189, n. 37 (D.C.Del.1983); *Dumas v. Town of Mount Vernon*, 612 F.2d 974, 977 (5th Cir.1980); Ramona L. Paetzold and Anne M. O'Leary–Kelly, *Continuing Violations and Hostile Environment Sexual Harassment: When is Enough, Enough?*, 31 Am. Bus. L.J. 365, 382 (1993) (Hereafter *"Continuing Violations* at ___.").

**3.** Tenn.Code Ann. § 4–21–101(a)(1) (1991 Repl.); *Bennett*, 826 S.W.2d at 121; *see also* Tenn.Code Ann. § 4–21–311 (1995 Supp.), which apparently applies the continuing violation doctrine in the context of the Tennessee Human Rights Act.

**4.** *Continuing Violations* at 383; *see, e.g., Haithcock v. Frank*, 958 F.2d 671, 678 (6th Cir.1992); *Dixon v. Anderson*, 928 F.2d 212, 216 (6th Cir.

1991); *Penton Indus. Pub. Co., Inc.*, 851 F.2d at 838.

**5.** *See, e.g., Bazemore v. Friday*, 478 U.S. 385, 394–95, 106 S.Ct. 3000, 3006, 92 L.Ed.2d 315 (1986) (current and continuing differential between the wages earned by black workers and those earned by white workers); *Held v. Gulf Oil Co.*, 684 F.2d 427, 430 (6th Cir.1982) (different and more burdensome workload given to female than to male which continued after the original discriminatory act); *Hall v. Ledex, Inc.*, 669 F.2d 397, 398 (6th Cir.1982) (additional and more burdensome duties assigned to female within the statute of limitations)(alternative holding).

policy of discrimination," and not merely the occurrence of an isolated incident of discriminatory conduct. *Id.*

In this case, there is no evidence of an overarching policy of discrimination; therefore, we have reviewed the record to determine if there is evidence to support a present discriminatory activity, including proof that at least one of the discriminatory practices occurred within the relevant limitations period. Federal courts have suggested three factors to consider in determining whether the discriminatory conduct amounts to a continuing violation or whether it is merely discrete, isolated, and completed acts which are individual violations:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Berry,* 715 F.2d at 981; *see also Selan,* 969 F.2d at 565, n. 6 (collecting cases).

We adopt and apply these factors to the record in this case. The limitations period for filing suit under the Tennessee Human Rights Act when plaintiff instituted this action was contained within Tenn.Code Ann. § 28–3–104(a), which required that suit be filed within one year of the alleged unlawful employment practice. *See Bennett,* 826 S.W.2d at 121.[6] Plaintiff brought this action

on June 22, 1992. Accordingly, to establish that her suit was timely filed, plaintiff had to show that some discriminatory act of sexual harassment occurred on or after June 22, 1991.

Plaintiff conceded at trial that no act of sexual harassment occurred after May 14, 1991. Though the alleged discriminatory actions before that time occurred with frequency, they did not extend into the relevant limitations period. As to permanency, plaintiff obviously understood her rights, at the latest, by May 15, 1991, when, after reading the employee handbook, she delivered the letter to Hillis outlining her complaint of sexual harassment.

Plaintiff argues, however, that the actions of her supervisor in giving her written reprimands, and Baker's decision to terminate her, were retaliatory and therefore bring her claim within the applicable limitations period. We disagree for several reasons. First, plaintiff conceded that she violated the rules which resulted in the written reprimands, and that she alone was not singled out and treated differently than the other employees. Accordingly, the record is devoid of evidence to establish that the written reprimands or Baker's decision to discharge were, in fact, retaliatory. Moreover, in determining whether a continuing violation is established, courts must consider whether the alleged acts involve the same type of discrimination. Here, the record is clear that the last act of sexual harassment occurred on May 14, 1991.[7] Although we held in *Campbell* that conduct underlying a hostile work environment claim need not be clearly sexual in nature, we emphasized that an employee must prove that she was subjected to disadvantageous terms or conditions of employment to which males were not exposed. *Id.* Plaintiff has failed to meet that standard

---

6. The General Assembly recently amended the THRA to add a statute of limitations, *see* Tenn. Code Ann. § 4–21–311 (1995 Supp.), which apparently incorporates the continuing violation exception and requires that a claim be filed "within one year after the alleged discriminatory practice ceases." This case, however, is governed by Tenn.Code Ann. § 28–3–104(a), which contains different language, since the new law did not become effective until May 22, 1992, after accrual of Spicer's claim.

7. The plaintiff's claim of retaliatory discharge against Baker was concluded by a voluntary dismissal and is not a subject of this appeal.

as to her supervisor's actions occurring after May 14, 1991. Although an employer certainly cannot use an employee's diminished work performance as a legitimate basis for removal where the diminished work performance is the direct result of the employer's discriminatory behavior,[8] there is no evidence in this record that the violations which precipitated plaintiff's termination resulted from discriminatory behavior on the part of her employer. Consequently, plaintiff has failed to establish a continuing violation and her action is time-barred.

### CONCLUSION

For the reasons articulated above, we adopt the continuing violation doctrine which allows a plaintiff to challenge an ongoing, continuous series of discriminatory acts in their entirety as long as one of those discriminatory acts falls within the limitations period. Because the record in this case establishes that all acts of sexual harassment occurred more than one year before the plaintiff commenced this action, the continuing violation doctrine does not apply and the plaintiff's action is time-barred. Accordingly, the Court of Appeals' judgment is affirmed. Costs of this appeal are taxed to the plaintiff, Judy G. Spicer, for which execution may issue if necessary.

BIRCH, C.J., and DROWOTA, REID and WHITE, JJ., concur.

---

**8.** *See DeGrace v. Rumsfeld,* 614 F.2d 796, 804 (1st Cir.1980); *Weiss v. United States,* 595 F.Supp. 1050, 1056 (E.D.Va.1984); *Silverberg v.* *Baxter Healthcare Corp.,* 52 Fair Empl. Prac. Cas. 1848, 1990 WL 70411 (N.D.Ill.1990).