IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE

FILED

May 4, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| JEFF HUBRIG, | ) | |
| | ) | |
| Plaintiff/Appellant | ) | ANDERSON CIRCUIT |
| | ) | |
| v. | ) | NO. 03A01-9711-CV-00525 |
| | ) | |
| LOCKHEED MARTIN ENERGY | ) | HON. JAMES B. SCOTT |
| SYSTEMS, INC.; | ) | JUDGE |
| LINC HALL, Individually; | ) | |
| LARRY PIERCE, Individually, | ) | |
| and JIM KOLLING, Individually, | ) | |
| | ) | AFFIRMED |
| Defendants/Appellees | ) | and REMANDED |

A. Philip Lomonaco, Knoxville, and Kathleen E. McGeechan, Kingston, for Appellant.

G. Wilson Horde and Patricia L. McNutt, Oak Ridge; E. H. Rayson and John C. Burgin, Jr., Knoxville, for the Appellees.

_____**O P I N I O N**

_____INMAN, Senior Judge

_____The plaintiff describes himself as a whistle blower, as that term has come to be used, and seeks damages for his termination from employment because he allegedly refused to participate in and keep silent about certain allegedly illegal corporate activities. The allegations were denied by the defendants whose motion for summary judgment was granted. The plaintiff appeals and presents for review the issues of (1) whether he was terminated for time card abuse and sexual harassment or whether these reasons were pretextual, (2) whether a common law cause of action for retaliatory discharge remains viable in this jurisdiction, and (3) whether his termination constituted outrageous conduct by the defendants. Our review of the findings of fact made by the trial Court is *de*

*novo* upon the record of the trial Court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. TENN. R. APP. P., RULE 13(d). *See, Byrd v. Hall,* 847 S.W.2d 208 (Tenn. 1993). We will refer to the plaintiff as Hubrig, or as the appellant, or as the plaintiff. This record is unusually prolix; *prima facie,* it appeared to reflect a trial by affidavit, an impermissible use of RULE 56, *see: Womack v. Blue Cross-Blue Shield,* 593 S.W.2d 294 (Tenn. 1980), but an in-depth analysis reveals that the trial court correctly held that the totality of the evidence demonstrates the absence of a genuine issue of fact or law. We therefore affirm the judgment.

## I

Lockheed Martin Energy Systems, Inc. managed and operated three government-owned facilities in Oak Ridge, Tennessee pursuant to a contract with the United States Department of Energy ["DOE"], one of which is known as the Oak Ridge National Laboratory ["ORNL"].

The plaintiff was employed in the Applied Technology Division ["ATD"] of ORNL from 1988 through 1991. In a memo dated April 18, 1991, he asked ATD Director Dean Waters to be "relieved of my current assignment" pending an investigation into allegations made against him, and expressed his regret that he had been unable to win the "proactive support of your staff" because a member of Waters' staff had "actively campaigned" against him "without consequence" resulting in "allegations of misconduct of office which are completely false and without merit." These allegations will be discussed later.

After meetings with Waters, the plaintiff filed a formal complaint on December 30, 1991 with ORNL Site Review Board alleging that Waters had harassed him beginning April 19, 1991 and that there were "project management problems, including cost overruns, incomplete or missing project

2

plans, and disagreement with sponsors over deliverables and schedules of performance." These charges led to two investigations, one relating to the treatment of the plaintiff and the other to the manner in which work had been conducted by that division.

A five-person Site Review Board investigated the plaintiff's complaint alleging mistreatment by Waters, while the Central Auditing Division examined his allegations of mismanagement. The Site Review Board, after conducting 35 to 40 interviews, issued a response to the plaintiff on July 22, 1992, concerning his complaint of ill-treatment by Waters, and found that Waters had engaged in *inappropriate management conduct* but that Hubrig "could have directly contributed to [his] situation . . . by [his] management style, interpersonal interactions, and [his] blind loyalty to Waters . . .." Remedial actions were specified. A more detailed report was submitted to Energy Systems' Management, which stated that the facts supported "Hubrig's allegations . . . of harassment," and that "Waters exercised poor judgment when he allowed Hubrig's autocratic and control-oriented management style to lead to alienation of managers and staff." It recommended an "immediate study of management practices."[1]

The lengthy report of the Central Auditing Division reviewed Hubrig's allegations of mismanagement and found several of them to be valid.

Before the Site Review Board issued its report, the plaintiff, then working as a Quality Assurance Specialist, by letter dated July 15, 1992, requested a meeting with Energy Systems President, Clyde Hopkins. He enclosed

---

[1]Hubrig expressed dissatisfaction with the response in a letter dated August 31, 1992, but took no further action. Among other things, he objected to the finding in the response, suggested by counsel, that Waters had engaged in "inappropriate managerial conduct" rather than "harassment." ORNL Director Trivelpiece sent Hubrig a letter apologizing for the "unfair treatment to which you were subjected" and his performance appraisal rating was increased to a "consistently exceeds" level. Trivelpiece later wrote Hubrig saying that he considered the matter closed.

documents about "critical issues" and "career objectives," and informed Hopkins of his objective "to facilitate remediation of the *dysfunctional management practices* within the Applied Technology Division" and to be reassigned to a "job position consistent with my position history . . .." Hopkins directed Robert Merriman, the Vice President of Energy Systems' Environmental Restoration and Waste Management Business Unit, to find a suitable position for Hubrig. Merriman asked Linc Hall, then Plant Manager at K-25, to consider Hubrig. Hall, after reviewing Hubrig's qualifications, appointed him Director of the newly-formed Institutional Planning and Facilities Management Division. The appointment was announced on August 31, 1992, more than two years before Hubrig's resignation.

Plaintiff remained Director of the Institutional Planning and Facilities Management Division from September 1, 1992 until February 1, 1994, at which time, as part of a reorganization to reduce the cost of operations at K-25, three organizations were eliminated. The work of Institutional Planning and Facilities Management was consolidated with another program, and Marvin Baer was appointed to head the newly consolidated division. Robert Eby was then Plant Manager of K-25. Eby made the decision to appoint Baer on the basis of Baer's experience and his judgment that Baer was the better manager. Eby believed that Hubrig had not performed well in the position for reasons unrelated to Hubrig's problems at the Applied Technology Division, of which Eby had not been informed. This decision was approved by Linc Hall, Vice President of Environmental Restoration and Waste Management. As a result of this reorganization, Hubrig became a member of Linc Hall's staff in the

4

Environmental Restoration Waste Management Business Unit, a move which did not affect his compensation or job level.

Hubrig says that shortly after he began his new position, Hall directed him to "coordinate appropriate changes to ensure 'verbatim worker compliance' with 'flowdown' requirements within the Environmental Restoration Program at K-25." Hubrig contends he engaged in protected activity by reporting corporate failure to protect workers. He relies upon findings of the Defense Nuclear Facilities Safety Board which were issued *months after* Hubrig was given his assignment by Hall but which also refers to issues at the Y-12 plant and not the K-25 plant where Hubrig worked. In this connection, the appellees argue that assertions in Hubrig's affidavit are either not based upon his own personal knowledge or reflect his own inferences drawn from ambiguous facts or from statements taken out of context.[2] More about this later.

It is not disputed that Linc Hall authorized the plaintiff to participate in an "Improvement Team" program in which Hubrig acknowledged that he enlisted the assistance of two subcontractor employees, Carol Hockett and Mary Hutson, as well as other employees.

In the summer of 1994, Hall learned that Hubrig was not regularly reporting for work and was not remaining at work for the required hours and was often seen in the company of Carol Hockett. He discussed these allegations with Larry Pierce, the Director of Human Resources at K-25, and after a preliminary examination of Hubrig's time cards, requested Central Auditing, headed by defendant Jim Kolling, to investigate the validity of the allegations.

---

[2]The plaintiff asserts in his affidavit that his team inadvertently started to "discover and document managerial negligence by Linc Hall's . . . direct employees" and makes an ambiguous reference about a "failure to comply with procedure and regulation."

The audit was completed in November 1994. It disclosed many irregularities in Hubrig's time cards, together with inaccurate arrival, lunch and departure times. Significantly, the audit documented ten unrecorded absences in January, March, May, and June, 1994, and documented instances where Hubrig's explanations were inconsistent with his own previous statements and directions to other employees, as, for instance, an occasion when he directed his secretary to "forward my time card for each month to me as soon as it is received" and that he would "complete the time card." The auditors concluded this statement contradicted Hubrig's assertions that he did not understand the time card system. Another example of an inconsistency concerned Hubrig's erratic time for reporting to work. His explanation was that he was unaware that he had a shift schedule.

The audit also examined whether Hubrig had a pattern of taking excessive lunch breaks and whether he had a pattern of leaving work early. The auditors found he often left work early and that his explanation - that he worked about a third of his overtime at home - was unsupported by documentation Hubrig said he could provide to them but did not.[3] For these and a number of other reasons, the audit concluded the foregoing constituted violations of company policy and procedures on hours of work and was inappropriate behavior for any Energy Systems employee. The plaintiff offered the off-setting defense that he frequently reported for work earlier than required.

The time card audit also involved the activities of Carol Hockett, then age 25, who was supervised by Hubrig and frequently seen in his company leaving

___

[3]The auditors also concluded that for Hubrig to have worked the amount of overtime he claimed to have worked would have required that he leave the K-25 facility between 8:30 p.m. and 10:30 p.m. And while Hubrig told the auditors on average he left the facility at those times, he had also inconsistently informed the auditors that he normally left work either between 4:00 to 4:30 p.m. or between 7:00 to 7:30 p.m. The earlier departure times were, moreover, confirmed by Ms. Hockett, who told the auditors that Hubrig usually left with her at that time.

the plant and elsewhere. She was questioned during the audit, and it came to light that she had more than a working relationship with Hubrig, who was married. Complaints of sexual harassment made by Carol Hockett and Mary Hutson to the Energy Systems' Ethics Office on November 23, 1994 were the critical developments in conjunction with the time card problems that led to Hubrig's resignation. The complaints by Hockett and Hutson against Hubrig appear to represent the point that sometimes the best defense is a good offense.

Ms. Hockett stated to Ethics Officer Barbara Ashdown that, during her relationship with Hubrig, they would meet off site, at restaurants and elsewhere, including the parking lot at K-25, for extended periods. They also met in her condo and in a motel bedroom. Hubrig gave her a ring and sent her notes expressing affection. Hockett explained that the relationship was "personal" and that Hubrig wanted her to be an administrative assistant in a business he had in mind but which never materialized. She had attempted to break off the relationship several times prior to the audit, as far back as December 1993, but on each occasion Hubrig "shunned" her and "would ignore" her, "provide no work direction, and exclude her from meetings." She said she resumed the relationship "due to the uncomfortable work environment."

Ms. Hockett told Ms. Ashdown that, on September 26, 1994, after the time card audit had commenced and because she was embarrassed at how others saw her in her relationship with Hubrig, she told Hubrig she would have nothing further to do with him "outside the fence," i.e., outside of her normal job duties. She also related to Ms. Ashdown that soon after this discussion with Hubrig his reprisals started anew and that they continued to the point she believed it necessary to make her complaint. She was excluded from team

7

meetings and was told by Hubrig that he "would not continue to provide me with opportunities for visibility or be able to support me much longer in my current job." In late October, Hubrig arranged to have a "team building facilitation" conducted by Energy Systems' employee Vivian Marshall with himself, Ms. Hockett, and Mary Hutson in attendance. Ms. Hockett described the meeting in this way:

> During this meeting, we were all asked what it would take to continue working as a team. I indicated that I needed to separate "inside" the fence activities from "outside" the fence activities. Hubrig responded that those activities were "seamless." Vivian called a caucus with Hubrig. The meeting reconvened, and Hubrig agreed that the team would function dealing only with "inside" the fence activities. Hubrig stated in front of others, i.e., Mary Hutson and Vivian Marshall [CCE facilitator for Team Building], that I had betrayed the team. *What he meant was that I had personally betrayed him by ending our personal relationship.*

Soon after this meeting, Ms. Hockett stated that she again was excluded from normal team activities, and related the incident that caused her to seek help and make her complaint:

> On November 17, 1994, Hubrig and I had a discussion about my work status. Hubrig said that he could not continue to work like we had been and indicated that he would not have a problem telling the Corporation that I was pursuing other employment. I told him that I wanted to continue working at Energy Systems. He said that we might need to clarify our understanding as to what had happened related to our relationship. Hubrig said for him to be able to feel that I had not betrayed his trust, it was necessary that we have a "seamless" relationship. He indicated that he did not want me to meet alone with Vivian Marshall and that if I wanted to keep my job, *I needed to get the Corporation off his back.*

Ms. Hutson went with Ms. Hockett to the meeting with Ms. Ashdown. She had observed Ms. Hockett's exclusion from team activities and told Ms. Ashdown the exclusion had been directed by Hubrig. Ms. Huston also said that Hubrig began spending literally days with her in talking about Ms. Hockett and that he started walking Ms. Hutson to her car several times a week, telling her

that she was "the only one who was keeping him going and that he needed my support and loyalty." This continued until Ms. Hutson told him that she could no longer speak with him about Ms. Hockett since it was causing her emotional distress. Ms. Hutson said, however, that on November 17, Hubrig called her at her home expressing concern over Ms. Hockett's plan to meet alone with Vivian Marshall. Ms. Hutson told Ms. Ashdown that, despite her entreaties to Hubrig that he desist, "Hubrig has persisted to harass me by inappropriately discussing personal issues with me, calling me at home, following me to my car, and talking of personal matters even though I have requested him to stop doing so. He has begun calling me names he used to call Hockett such as kiddo, coach, counselor. He has used me and the corporation and even used team facilitation to try to regain his personal relationship with Hockett. For the past eight weeks very minimal work has been performed, with the majority of time spent in discussions related to Hockett."

The investigation of these complaints, along with the time at work audit, was reported to Hall and Pierce. On December 1, 1994, they and Kolling met with Hubrig to discuss the results of the audit in which plaintiff's time card and work time irregularities were found. Hubrig was informed that the audit report disclosed substantial variances in his time at work as recorded and his actual time at work, and that the time card abuse was an extremely serious matter. Plaintiff denied any intent to defraud the company and stated that he was *ignorant of the timekeeping method,* an explanation that Hall found incredible. The plaintiff was reminded that he was a senior manager and of all the training that he had received relative to timekeeping and attendance at work.

Hubrig does not seriously disagree about this meeting, although he stated that he "did not clearly understand what was being said," and asked for "further clarification" which was denied. According to his own affidavit, however, he had already met with the auditors three times for a total of eight hours and had discussed the matter with them over the telephone on at least six occasions.

On December 2, 1994, Ms. Hockett and Ms. Hutson provided Ms. Ashdown with signed statements about their harassment by Hubrig. This information was provided to Linc Hall and Larry Pierce, who met with Energy Systems' President Gordon Fee, Vice President Mack Wilson, Robert Worrell of Human Resources, General Counsel G. Wilson Horde, and Deputy General Counsel Patricia L. McNutt to discuss Hubrig's situation. Hall, Pierce and Wilson recommended that if the allegations of sexual harassment were credible, Hubrig should be terminated with instructions that Ms. Ashdown speak with Ms. Hockett again and that Hubrig be given an opportunity to respond to the allegations.

Four days later, Hall and Pierce, along with Bruce Kimmel [for whom Hubrig was working at the time], met with Hubrig, who was informed of the charges by the two female employees and was given an opportunity to make any explanation he wished. Larry Pierce's notes of the meeting reflect the following:

> A meeting was held in Linc's office to confront Hubrig with the allegations made by the two women. Present were Linc [Hall], Larry [Pierce], Jeff [Hubrig], and Bruce Kimmel, for whom Hubrig has been working during the last several months. Linc explained the purpose of the meeting, and Larry proceeded to summarize the allegations of both parties. He worked from the two yellow sheets attached and Numbered 2 and 3. He characterized the allegations as extremely serious. Hubrig once again denied any wrongdoing whatsoever. He repeatedly used flowery descriptors like "leadership venture," "leadership journey," "lines of inquiry," and "shared vision." He

basically explained away Hockett's allegations by stating that she could not decide whether she wanted to stay or leave. Hubrig portrayed himself as being concerned only with the welfare of the team and the work to be performed. With respect to Hutson, he flatly denied her allegations of wasting time and following her to the parking lot. Hubrig was never pressed on specifics except on two occasions. Larry asked if he had spent up to one hour in the parking lot talking to Mary during the time the audit was transpiring. He stated, "I don't recall." When asked if he had accompanied her to the parking lot prior to the beginning of the audit, he again stated, "I don't recall." He portrayed Hockett and Hutson as being devastated by the audit, wishing to distance themselves from Jeff Hubrig. During this meeting he alluded to the fact that Don White, an ER employee overseeing their work, could attest to Hockett's unusual behavior of recent days. Linc told Jeff that these matters were serious and that the former could be terminated. Hubrig asked if he needed to get an attorney or take other action. Hubrig wanted more time to respond to the allegations. The meeting ended at approximately 3:15 p.m. Hubrig asked for one minute alone with Linc at the end of the meeting.

Hubrig's version of this meeting is not materially different. He acknowledges being told that he was not to see the two female employees again either "inside or outside the fence." He says that he asked for "specific details and the opportunity to provide evidential proofs that the allegations of harassment were unfounded" but was denied this request. He also stated that he "could not clearly understand the allegations." At the conclusion of the meeting, plaintiff was informed that the facts would be carefully weighed and that the company would make a decision within a few days and then get back with him.

In his affidavit, Hubrig says that he was not given details and thus was not permitted to provide 'evidential' proof that the allegations were unfounded. The affidavit (written after each of his accusers had been deposed) significantly does not deny having a "personal relationship" or friendship with Ms. Hockett nor her assertion that he treated her "differently" after she tried to break off their affair. Hubrig says in his brief that he and Ms. Hockett enjoyed a

11

"consensual and mutually beneficial relationship" and that after it ended in September 1994 "he was distraught, continually requesting reconsideration, and seeking help from others to understand Hockett's actions." He does not deny Ms. Hockett's assertion that he excluded her from team meetings or told her that he would not continue to provide her with opportunities for "visibility" and would be unable to support her in her current job. While Hubrig denies having had sexual intercourse with Hockett (which is consistent with her testimony as well) and denies having had a romantic relationship with her, he admits that on at least one occasion, he and Ms. Hockett rented a motel bedroom together, in Hockett's name, for the purpose of deciding whether that room was fit for use as a meeting place for his business, and further admits that he gave her a ring for her 25th birthday.

Continuing the saga, Ms. Ashdown and Sandy Davis of the Human Resources Department met with Ms. Hockett on December 7 to review the facts with her. Hockett reiterated that her relationship with Hubrig had not involved sexual intercourse but was one of "heavy intimate personal contact" which generally occurred off the work site usually in a park or a car after work. Hockett told Ashdown that Hubrig's exclusion of her from normal work activities led her, in November, to conclude that she needed to seek other employment and that if she was going to continue in her current position she would have to have a personal relationship with Hubrig.

Based on Ashdown's report and the prior reports and audit, Energy Systems' senior management, including Hall, Pierce and President Fee, concluded that it was necessary to terminate the plaintiff, who, in the meantime, had been hospitalized with chest pains and was absent from work until early

12

January 1995, when he returned. Hall and Pierce met with him on January 4, 1995, and informed him that management had reviewed the findings discussed with him in previous meetings and had concluded it was necessary to terminate his employment. Hubrig was informed that Energy Systems had decided to terminate his employment because of the violations relating to the time cards and his involvement with Hockett and the other subcontractor employee. Pierce said, "I explained, when asked, that Jeff [Hubrig] had specifically tied Ms. Hockett's continued membership on the 'team' to continuing their outside relationship." Hubrig again denied any wrongdoing but Pierce "stated clearly that, 'the debate is over'."

Hall advised plaintiff that the termination was not reflective of his "work," but dealt with his conduct and actions that had been explained to him. Plaintiff was given the opportunity to resign which he accepted. At the conclusion of the meeting, Hall shook plaintiff's hand and wished him well.

## II

*Byrd, supra,* directs that the following determinations should be made in ruling on a motion for summary judgment: (1) whether a *factual* dispute exists; (2) whether the disputed fact is *material* to the outcome of the case; and (3) whether the disputed fact creates a *genuine* issue for trial. "[T]he burden then shifts to the nonmoving party to set forth specific facts . . . establishing that there are indeed disputed, material facts creating a genuine issue." *Id.* A genuine issue exists only if a "reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.* At 215.

Hubrig argues that he established a genuine issue of material fact as to the honesty of the defendants' belief that he engaged in time card abuse and

13

harassment of two female employees. We disagree, because this contention finds no support in the record, which clearly reveals that his own misconduct was the sole cause for his termination.

T.C.A. § 50-1-304 as pertinent provides:

(a) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.

(b) As used in this section, "Illegal activities" means activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare.

(c) Any employee terminated in violation of subsection (a) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Under T.C.A. § 50-1-304, an employee claiming he was discharged because he refused to remain silent about "illegal activity" must show that this was the sole reason for his discharge. *Griggs v. Coca-Cola Bottling Co.,* 909 F.Supp. 1059, 1065 (E.D. Tenn. 1995). An employee must show "an exclusive causal relationship" between the discharge and protected activity, *Id., citing Merryman v. Central Parking System, Inc.,* 1992 WL 330404 (Tenn. Ct. App. 1992), and *Leeman v. Edwards,* 1994 WL 560889 (Tenn. Ct. App. 1994) (both overruled on other grounds), *Mason v. Seaton,* 942 S.W.2d 470 (Tenn. 1997). The elements are as follows:

(1) the plaintiff's status as an employee of the defendant;

(2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities;

(3) the employer's discharge of the employee;

(4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.

14

*Merryman.* According to *Mason*, the second element requires a showing that the employee spoke out about illegal activities in the workplace. An instruction to remain silent is not required.

We agree with the appellee that this record reveals no genuine issue of material fact as to the reason for Hubrig's termination. In *Mason*, the Supreme Court held that T.C.A. § 50-1-304 initially requires the employee to submit evidence of a causal link between the protected act and the employee's discharge, which then imposes upon the employer the burden of showing the reason for the discharge. *Mason,* 942 S.W.2d at 473. The record is clear that Energy Systems proved a legitimate, non-pretextual reason for discharging Hubrig: the audit findings with respect to his improper time card charges and the charges of sexual harassment which were credited. The burden then became Hubrig's to show that the reason was pretextual, meaning "a phony reason for some action." *Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995). In order to defeat summary judgment Hubrig must present specific admissible facts which realistically challenge the defendants' stated reasons. *Wilkins v. Eaton Corp.,* 790 F.2d 515, 521 (6th Cir. 1986); *Silpacharin v. Metropolitan Gov't.,* 797 S.W.2d 625, 629 (Tenn. App. 1990).

Conclusory statements of the employee do not constitute proof of pretext. We recently held that the employee's "subjective interpretation of [the employer's] actions does not create an issue of fact sufficient to defeat a properly supported summary judgment motion. *DeVore v. Deloitte & Touche,* 01A01-9602-CH-00073 (Tenn. App. 1998); *Accord, McCain v. Airport Honda,* 1996 WL 557794 (Tenn. App. 1996).

The material issue here is not whether Hubrig actually sexually harassed Hockett and Hutson; rather, "the inquiry . . . is limited to whether [the decision makers] *believed* [the employee] was guilty of harassment." *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991); *Timm v. Mead Corp.,* 32 F.273, 275 (7th Cir. 1994) ("It is always the employer's honestly held beliefs that control.")

These principles clearly apply here. According to the Supreme Court in *Mason:*

> "The cause of action for retaliatory discharge defines the balance point between the employment-at-will doctrine and rights granted employees under well-defined public policy." *Anderson v. Standard Register Co.,* 857 S.W.2d at 556; *Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d 822, 824 (Tenn. 1994). Employment-at-will is the fundamental principle controlling the relationship between employers and employees. That principle was stated in *Harney v. Meadowbrook Nursing Center,* 784 S.W.2d 921, 922 (Tenn. 1990), as follows: "The long standing rule in this State is that an employee-at-will may be discharged without breach of contract for good cause, bad cause or no cause at all, without being thereby guilty of legal wrong." This doctrine recognizes that employers need the freedom to make their own business judgments without interference from the courts. "[A]n employer's ability to make and act upon independent assessments of an employee's abilities and job performance as well as business needs is essential to the free-enterprise system." *Clifford v. Cactus Drilling Corp.,* 419 Mich. 356, 353 N.W.2d 469, 474 (1984). However, even under the common law, an employee is protected from discharge in retaliation for attempting to exercise a statutory or constitutional right, or in violation of a well-defined public policy. *See e.g., Conaster v. Clarksville Coca-Cola,* 920 S.W.2d 646 (Tenn. 1995); *Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d 822 (Tenn. 1994); *Anderson v. Standard Register Co.,* 857 S.W.2d 555 (Tenn. 1993); *Hodges v. S. C. Toof & Co.,* 833 S.W.2d 896 (Tenn. 1992); *Chism v. Mid-South Milling Co.,* 762 S.W.2d 552 (Tenn. 1988); *Clanton v. Cain-Sloan Co.,* 677 S.W.2d 441 (Tenn. 1984).

*Mason,* 942 S.W.2d at 474; *accord, Stein v. Davidson Hotel Co.,* 945 S.W.2d 714, 717 (Tenn. 1997).

Hubrig's asserted misconduct as a supervisor towards both female employees subjected Energy Systems to potential civil liability to them had they

16

chosen to pursue a "hostile work environment" theory. *Campbell v. Florida Steel Corp.,* 919 S.W. 2d 26, 33 (Tenn. 1996); *Spicer v. Beaman Bottling Co.,* 937 S.W.2d 884 (Tenn. 1996); *see also Pierce v. Commonwealth Life Insurance Co.,* 40 F.3d 796 (6th Cir. 1994). As heretofore stated, Ms. Hockett informed the company that after she tried to break off her relationship with Hubrig, he excluded her from team meetings and told her that he would not continue to provide her with opportunities for "visibility" and would not support her in her current job. The defendants cannot be faulted for taking "prompt and effective remedial relief," because Hubrig had been credibly accused by two female employees. Given the current legal climate, this conduct could not be condoned, particularly in light of the painstaking investigation of the charges.

Moreover, Hubrig's retaliation against Hockett for terminating their relationship potentially subjected Energy Systems to a *quid pro quo* harassment lawsuit. "The employer is strictly liable for a supervisor's *quid pro quo* harassment under the doctrine of respondeat superior." *Carr v. United Parcel Service,* 955 S.W.2d 832, 837 (Tenn. 1997); *Sanders v. Lanier,* _____S.W.2d _____(Tenn. 1998).

An employer's obligation to eliminate unlawful harassment from the workplace requires the employer to take action once it knows of the harassing conduct even if the conduct does not rise to the level of being actionable by the harassed employee. As observed in *Chalmers v. Quaker Oats Co.,* 61 F.3d 1340, 1346 (7th Cir. 1995), if an employer's harassment policy was not consonant with federal law, the employer would be "hamstrung in its efforts to take measures to stop such conduct before it became so abusive and offensive that the company was vulnerable to a Title VII lawsuit."

As we have seen, Energy Systems conducted an investigation and found both women's claims credible, as contrasted to Hubrig's "non-denial denials" and "flowery descriptors." Having made these findings, Energy Systems was clearly justified in taking action reasonably calculated to prevent any future harassment.

> Whether the employer is liable for its supervisor's actions in hostile work environment claims depends on: (1) whether the supervisor's harassing actions were foreseeable or fell within the scope of employment; and (2) even if they were, whether the employer responded adequately and effectively to negate liability." *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 803 (6th Cir. 1994). Accordingly, the employer's liability is predicated on its reaction to the discriminatory conduct.

*Carr,* 955 S.W.2d at 838. Energy Systems argues, and we agree, that it had the right to act and the right to conclude that it should terminate an employee given to such conduct, even if it believed the women were not going to file an action against it.

The record is clear that the decision to terminate Hubrig was influenced also by the audit of his time cards and by his evasive and vague responses to both the time card and sexual harassment charges. The time card audit was headed by Linda Chappell, a CPA employed by the company, who reviewed the relevant time records, and interviewed the plaintiff and other employees, including Ms. Hockett, as part of the audit. She heard every contention the plaintiff claims he was not permitted to make to Larry Pierce and Linc Hall. Hubrig does not deny that he had not reported paid absences on his time cards, as reported by the auditors:

> In conclusion, our review substantiated the allegation that Mr. Hubrig did not accurately report the hours he worked (eight days of unrecorded vacation and two days of unrecorded sick leave). Although Mr. Hubrig's late arrivals, early departures, and excessive lunch breaks did not have to be recorded on his time card, they were

violations of company procedures and standards, including Energy Systems Procedure CP-153, *Hours of Work;* Energy Systems Standard ESS-AC-103, *Internal Time Administration;* Energy Systems Procedure ESP-LR-251, *Personal Leave;* and Energy Systems Procedure LR-201, *Attendance and Absence Monitoring.* In our opinion, the ten unrecorded absences and violations of basic procedures indicate a pattern of behavior that is inappropriate for any Energy System employee.

The plaintiff's suggestion that the defendants somehow manufactured "trumped up charges" of "illusory time card abuse" and harassment at the highest levels of the company is unsupported rhetoric, and does not create a genuine issue of material fact.

The plaintiff asserts that he did nothing which "merited termination," a wholly subjective declaration. He was an at will employee, and Energy Systems was not required to have "just cause" to terminate him. *Chalmers,* 61 F.3d at 1346. As stated in *Mason v. Seaton,* "employers need the freedom to make their own business judgments without interference from the courts." 942 S.W.2d at 474.

Hubrig did not establish that his claimed protected activities were the "sole" reason for his termination/resignation, or that those activities played *any* role in his termination/resignation.

### III

Hubrig asserts that the trial court should have allowed him to amend his complaint to assert a common law cause of action for damages for retaliatory discharge, on the theory that the common law right survived the passage of T.C.A. § 50-1-304.

Tennessee courts have recognized two different actions for damages for "retaliatory discharge." The first action recognized in Tennessee was for asserting a claim for workers' compensation benefits. *Clanton v. Cain-Sloan*

19

*Co.,* 677 S.W.2d 441, 445 (Tenn. 1984); *accord Conaster v. Clarksville Coca-Cola,* 920 S.W.2d 646 (Tenn. 1995). In *Harney v. Meadowbrook Nursing Ctr.,* 784 S.W.2d 921, 922 (Tenn. 1990), the court emphasized that its decision had not created a new exception to the employment at will doctrine, but "merely recognized that implicit within the provisions of T.C.A. § 50-6-114 a cause of action existed . . .."

The Court considered another action for retaliatory discharge in *Chism v. Mid-South Milling Co., Inc.,* 762 S.W.2d 552, 555, 557 (Tenn. 1988), and shortly thereafter in *Watson v. Cleveland Chair Co.,* 789 S.W.2d 538, 544 (Tenn. 1989). Despite the fact that the Court upheld the dismissal of the claims in both cases, in *Watson,* the Court stated that:

> We have expressed our accord with the opinion of the Court of Appeals, that a cause of action for retaliatory discharge arises when an at-will employee is terminated solely for refusing to participate, continue to participate, or remain silent about illegal activities.

In response to these two decisions, the General Assembly enacted T.C.A. § 50-1-304.

By its plain terms, the statute does not cover the first type of retaliatory discharge claims - where the employee claims to have exercised a statutory right to benefits. For those kind of claims, the common law cause of action continues to exist, *Anderson v. Standard Register Co.,* 857 S.W.2d 555 (Tenn. 1993), and employees need only show that their exercise of the statutory right to workers' compensation benefits was a "substantial factor" in their termination. *Id.*

Prior to the passage of T.C.A. § 50-1-304, the appellate courts had not clearly settled on whether a plaintiff was required to show that protected activity was either a substantial factor or the sole cause of termination. But the statute supplied the answer; it clearly requires the employee to show that the

20

*sole* cause of his termination was his refusal to remain silent about illegal activities in the workplace.

The appellant argues that the "element of causal nexus" may have a lower threshold of proof at common law than under the statute, thus justifying the amendment. The issue of whether the statute displaced any common law claim, or is merely cumulative, *see: Reynolds v. Ozark Motor Lines,* 887 S.W.2d 822 (Tenn. 1994), is not crucial. The burden of proof is the same and does not shift. The issue is the same under either theory.

## IV

In order to make a *prima facie* case under the statute, an employee must show that he spoke out about or refused to participate in "illegal activities." Since the plaintiff does not contend he refused to participate in illegal activities, he must show he spoke out about "activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." T.C.A. § 50-1-304(b). We agree with the appellee that the activities he complains of in his affidavit do not constitute illegal activity. *See, Chism, supra.*

When the plaintiff became a member of Linc Hall's staff in February 1994, he was assigned the task of developing certain work standards and requirements to be used in implementing procedures. He asserts in his affidavit that his "team" had discovered and begun to document "managerial negligence" by Linc Hall and others. But "managerial negligence" is not an "illegal activity." *Robins v. Flagship Airlines, Inc.,* 956 S.W.2d 4, 7(Tenn. App. 1997) (employee's insistence that his former "department is poorly run" did "not even approach the subject of statutory or regulatory violations.") What is more, the

document relied upon by Hubrig to support this claim merely states that "It has been determined that some upper-level tier requirements that have been brought down have no clear guidelines defined. One concern appears to be regarding the lack of attention devoted to this issue by the ERWM [Environmental Restoration Waste Management] Quality Programs Office."

## V

We do not consider it necessary to discuss the claim of outrageous conduct. The record is wholly devoid of any evidence which remotely suggests that the defendants engaged in such conduct.

## VI

Finally, in *Carr v. United Parcel Service,* 955 S.W.2d 832 (Tenn. 1997), the Supreme Court made it clear that the definition of employer in T.C.A. § 50-1-304 did not impose individual liability on supervisors. Thus, none of the individual defendants can be liable on the theory that they terminated the plaintiff's employment.

The judgment is affirmed at the costs of the appellant.

_____
                             William H. Inman, Senior Judge

CONCUR:


_____
Houston M. Goddard, Presiding Judge


_____
Herschel P. Franks, Judge