**Laurie REED, Plaintiff,**

v.

**CRACKER BARREL OLD COUNTRY STORE, INC., d/b/a Cracker Barrel Old Country Store, Defendant.**

No. 2–99–002.

United States District Court, M.D. Tennessee, Nashville Division.

Oct. 26, 2000.

---

David A. Burkhalter, II, Kirk J Angel, Ronald A. Rayson, Burkhalter & Associates, P.C., Knoxville, for Laurie G. Reed.

John Thomas Feeney, III, Feeney & Murray, PLLC, Nashville, for Cracker Barrel Old Country Store.

## MEMORANDUM

TRAUGER, District Judge.

Pending before the court is a Motion for Summary Judgment from Defendant Cracker Barrel Old County Store, Inc. ("Cracker Barrel"), (Docket No. 42), to which the plaintiff has responded, (Docket No. 45), and the defendant has filed a reply. (Docket No. 51) For the reasons stated hereafter, the defendant's motion will be **GRANTED** in part and **DENIED** in part.

## I. FACTS

Plaintiff began working for Defendant as a server at a Cracker Barrel Restaurant in Crossville, Tennessee, in February 1996. (Docket No. 47, para. 2) She continued in her position as a server at the Crossville Cracker Barrel until her termination on January 8, 1998. (Docket No. 47, para. 63; Docket No. 52) During the period between February 1996 and January 1998, Kirk Hooper also worked at the Crossville Cracker Barrel, first as an associate manager and then as an assistant manager. (Docket No. 47, para. 57; Docket No. 52) In this position, he was one of the plaintiff's supervisors and, with other assistant and associate managers, was responsible for scheduling the servers and other workers, assigning servers to sections of the restaurant, and supervising the servers and other restaurant employees at work. (Docket No. 40(1), Deposition of Laurie Reed at 153–54, 174) Among his other responsibilities, Hooper had the responsibility to discipline and to terminate the plaintiff. (Docket No. 47, paras. 58–59; Docket No. 52)

Sometime shortly after the plaintiff began working at the Crossville restaurant, she claims that Hooper began making inappropriate comments and jokes directed at her and in front of her to other Cracker Barrel employees. (Docket No. 40(1), Dep. Laurie Reed at 84–85) Although the plaintiff admits that the comments did not initially offend her, she claims that, by early summer 1996, his comments had worsened. *Id.* at 83–84. According to the plaintiff, the following comments and incidents occurred between the summer of 1996 and late October 1997:

1. Beginning in early Summer 1996, Hooper began telling "dirty" jokes, providing the plaintiff with statistical information regarding sexually transmitted diseases, and describing his sex life in detail. (Docket No. 40(1), Dep. Laurie Reed at 84, 90)

2. Hooper repeatedly talked to the plaintiff about sexual encounters he had with his girlfriend, *id.* at 84–95, including discussing: (1) "eating out" his girlfriend, *id.* at 84–85; (2) "screwing on the kitchen table," *id.* at 90, 92, 94; (3) his girlfriend giving him "one hell of a blow job," *id.* at 90, 95; and (4) his girlfriend telling him he was better in bed than her ex-husband, who was also an employee of the Crossville restaurant, *id.*

3. In September 1996 when the plaintiff began dating Benjamin Reed (later her husband) who was also an employee of the Crossville Cracker Barrel, Hooper began making comments about their sexual relationship,

such as: (1) "I heard Ben wore you out last night," *id.* at 102–05; (2) "I heard about last night," *id.* at 104; and (3) "Don't call me while you and Ben are screwing," *id.* at 105–06.

4. Throughout 1996, Hooper repeatedly touched the plaintiff, including rubbing his hand on the plaintiff's back, *id.* at 105, rubbing his stomach against the plaintiff, *id.* at 109, touching the plaintiff when she walked past, *id.*, touching the plaintiff's shoulders, *id.* at 109–110, and rubbing the plaintiff's buttocks, *id.*

5. In Fall 1996, when the plaintiff was kneeling in front of the cabinets containing items for the salad bar, Hooper approached her, placed his hand on her head, put his crotch in her face, and said, "While you are down there . . . ." *Id.* at 110. Plaintiff began to cry in response to this suggestion and had to go to the employee restroom to calm down before returning to work. *Id.* at 113.

6. On one occasion, Hooper was assisting the cooks when the plaintiff approached and requested an order of fried apples. Hooper responded by saying, "I know what you're doing with fresh fruit. I heard all about the cucumbers." *Id.* at 120.

7. When the plaintiff became pregnant in late 1996, Hooper refocused his comments on this condition and made such comments as, "Pregnant women turn me on," and "I can't wait until your boobs get bigger and your butt gets wider," *Id.* at 122–24. These comments occurred as often as twice a week and stopped only while the plaintiff was on maternity leave, July and August 1997, because the plaintiff did not visit the store. *Id.* at 124–26, 132.

8. While she was pregnant, Hooper often touched the plaintiff's stomach, often in conjunction with remarks about being attracted to or "turned on" by pregnant women. (Docket No. 40(1), Dep. Laurie Reed at 162)

9. When the plaintiff returned to the Cracker Barrel to discuss her schedule on return from maternity leave, Hooper approached the plaintiff and stated, "It looks like the titty fairy came to see you." *Id.* at 132.

10. When the plaintiff returned to work in early Fall 1997, Hooper said, "I bet your pussy is all stretched out now." *Id.* at 134–35.

11. Throughout Fall 1997, Hooper continued to make comments such as the above, as well as comments like "[your] boobs are going to fall down to your knees." *Id.* at 138.

The plaintiff asserts that these are only examples of what Hooper said and did to her on a regular basis. (Docket No. 40(1), Dep. Laurie Reed at 105, 124, 161–62) She claims that this behavior continued until late October 1997, when she directly confronted Mr. Hooper and told him that his actions and comments were inappropriate and had to stop. *Id.* at 138; Docket No. 47, para. 35. After this point, the parties agree that all comments and actions of a sexual nature by Mr. Hooper stopped. (Docket No. 47, para. 36)

The plaintiff claims that when Hooper made the remark referenced in No. 9 above, she complained to another Assistant Manager, Katherine O'Rourke about his comments and behavior.[1] (Docket No. 40(1), Dep. Laurie Reed at 135–37) O'Rourke allegedly told the plaintiff that "that's Kirk" but that she would "see what she could do." *Id.* at 136. The plaintiff heard nothing further from Ms. O'Rourke and alleges that Hooper's comments continued until she directly confronted him a few weeks later, in late October 1997. *Id.* at 136–37.

Although the sexual comments stopped in late October 1997, the plaintiff claims that Hooper replaced them with hostile

---

1. Ms. O'Rourke denies that any such conversation took place. (Docket No. 47, para. 33; Docket No. 40(5), Deposition of Katherine O'Rourke, at 18–19)

remarks directed to her and to other employees about her. According to the plaintiff, Hooper told new employees to stay away from her, that she was "trouble" and "didn't know how to keep her mouth shut." (Docket No. 40(1), Dep. Laurie Reed at 142, 144) In addition, the plaintiff alleges that Hooper began treating her differently as an employee. *Id.* at 149–50. When he made the servers' schedule—a responsibility that alternated between the assistant managers—Hooper began to schedule the plaintiff to work until closing on every shift she worked. *Id.* at 149. In addition, Hooper scheduled the plaintiff to work "wildly fluctuating hours." *Id.* at 150–51. The plaintiff stated, "Some days I worked from 11:00 in the morning until 11:00 at night, and no one wanted that shift. No one had to do that shift." *Id.* at 246.

When Hooper and the plaintiff worked the same shift, he assigned the plaintiff to a section of tables in the center of the room, which was regarded as an undesirable section. *Id.* at 174–75. According to the plaintiff, "nobody wants to sit in the middle, where everybody's around them. Everyone wants to sit on the outside." *Id.* at 174. Customers were seated in the center after other sections were full and, as a result, the server assigned to the center section often had fewer customers and, therefore, fewer tips. *Id.* at 175. The plaintiff claims that this was common knowledge. *Id.* And while the plaintiff admits that "everybody is stuck with the middle every once in a while," she claims that after October 1997, she "was there quite often, very often, a lot." *Id.*

In addition, Hooper would not allow the plaintiff to leave before closing, regardless of what the employee schedule stated.[2] *Id.* at 149. He would often allow other servers to leave before the plaintiff, even when the plaintiff came to work first or was scheduled to leave before someone else. *Id.* at 149, 154–55. The plaintiff questioned Hooper about these decisions on a number of occasions. When Hooper allowed another server to leave and made the plaintiff stay, Hooper told her it was because he liked the other server better because "she doesn't have a big mouth." *Id.* at 149–50. At other times, Hooper would respond to the plaintiff's questions about her schedule and work assignments by asking, "What have you done for me lately?" *Id.* at 154–55.

The plaintiff claims that in response to this behavior, she wrote a letter to the Cracker Barrel Home Office, detailing the sexual comments and actions as well as the hostile remarks and actions by Hooper.[3] *Id.* at 144–45. In addition, the plaintiff states that she complained of Hooper's treatment of her to another assistant manager, Donna Golliher. *Id.* at 155–56. The plaintiff claims that she told Ms. Golliher of the sexual comments and conduct, her demand that he stop, and his hostile actions and remarks since then. *Id.* Approximately two weeks later, at the beginning of December, Ms. Golliher told the plaintiff that she had spoken to Mr. Hooper.[4] *Id.* at 107, 155–56.

The plaintiff's final day of working at the Crossville Cracker Barrel was January

**2.** The ability of a server to leave at the end of a shift, as well as the section assignments, are decisions made by the manager on duty during that shift. A server cannot end her shift without permission from the manager on duty. Generally, the servers worked on a first-on, first-off basis, meaning that the server who began working first would be allowed to leave first. (Docket No. 40(1), Dep. Laurie Reed at 149, 154)

**3.** The defendant denies receiving a copy of this letter (Docket No. 43 at 11), and the plaintiff did not keep a copy. (Docket No. 47,

para. 45) It is undisputed that the plaintiff had sent a previous letter to the Home Office in Fall 1997, detailing other complaints about the management and running of the store. *Id.*, paras. 41–43. This letter, a copy of which was returned to the plaintiff, did not contain any allegations of sexual harassment. *Id.*, para. 43.

**4.** Like Ms. O'Rourke, Ms. Golliher denies that either conversation took place. (Docket No. 47, para. 33; Docket No. 40(4), Deposition of Donna Golliher, at 17)

4, 1998. (Docket No. 47, para. 7) It is undisputed that her brother, with his wife and infant, ate at the Cracker Barrel that evening and that the plaintiff did not charge her brother for two beverages that they had ordered, costing about $2. (Docket No. 47, para. 7; Docket No. 40(1), Dep. Laurie Reed at 185) It is also undisputed that at some time later during her shift, Mr. Hooper questioned the plaintiff about the incident. (Docket No. 47, para. 9; Docket No. 40(1), Dep. Laurie Reed at 188–90) The plaintiff first denied giving "them" free drinks and then offered "I don't know" as her explanation for not charging for the beverages. (Docket No. 47, para. 8; Docket No. 40(1), Dep. Laurie Reed at 188–89) What is hotly disputed is why the plaintiff did not charge for the drinks, whether she had the authority to make that decision, the nature and tone of her conversation with Mr. Hooper, and the reasons for her responses to his questions. (Docket No. 46 at 6–7; Docket No. 43 at 2)

Taken in the light most favorable to the plaintiff, her brother was dissatisfied with his food because it had taken too long and was not prepared as he had requested. (Docket No. 40(1), Dep. Laurie Reed at 184) The plaintiff offered to fix the problem by getting a new order, but he did not want to wait. *Id.* The plaintiff, knowing or believing that it was store policy to offer free salads or desserts or drinks to satisfy an unhappy customer, offered her brother either a salad or dessert, both of which he refused. *Id.* at 185. The plaintiff then removed the charge for the beverages to "comp" (compensate) her brother for his dissatisfaction. *Id.* Sometime later, Mr. Hooper confronted the plaintiff by grabbing her arm, pulling her into an alcove, and demanding to know why she had given "them" free drinks. *Id.* at 158, 189. Plaintiff claims that she did not know what Mr. Hooper was talking about and was extremely uncomfortable with their physical proximity and with the grabbing of her arm. *Id.* at 189–91. Her responses were confused and hurried in an attempt to end the confrontation. She walked away from

him and completed her shift without further difficulty. *Id.* at 193–94.

The plaintiff was contacted by Mr. Hooper later that week and was told to speak to Mr. Miller and to Mr. Hooper when she came in on Thursday to pick up her paycheck. *Id.* at 194–95. At that meeting, the plaintiff was given a termination form, completed and signed by Mr. Hooper, that indicated that she was being terminated for violating company policy both by giving out free beverages and by lying when questioned about it. (Docket No. 47, para. 12) The plaintiff was told to sign her dismissal form and to leave. (Docket No. 40(1), Dep. Laurie Reed at 197–99) Mr. Miller handled the discussion while Mr. Hooper looked on, and at no point was the plaintiff questioned regarding her version of the events of January 4th. *Id.*

The plaintiff filed claims with the Equal Employment Opportunity Commission and with the Tennessee Human Rights Commission on July 18, 1998. (Docket No. 47, para. 13) She received a right to sue letter dated January 7, 1999, and she filed this lawsuit on January 8, 1999. *Id.*, para. 1.

## II. ANALYSIS

### A. Summary judgment standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989). In deter-

mining whether the moving party has met its burden, the court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon*, 107 F.3d 1171, 1174–75 (6th Cir.1997). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. *Id.*, at 255, 106 S.Ct. at 2513.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–252, 106 S.Ct. 2505.

In this case, the defendant asserts five separate arguments on summary judgment: (1) plaintiff's *quid pro quo* and hostile environment sexual harassment claims under the Tennessee Human Rights Act are barred by the statute of limitations; (2) plaintiff cannot make out a *prima facie* case under Title VII for *quid pro quo* sexual harassment; (3) defendant is entitled to judgment as a matter of law on plaintiff's hostile environment sexual harassment claim because the defendant can meet the elements of the affirmative defense under *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); (4) plaintiff cannot establish a *prima facie* case of retaliatory discharge under Title VII and the Tennessee Human Rights Act; and (5) even if plaintiff can make out a *prima facie* case of retaliatory discharge, the defendant is entitled to judgment as a matter of law because the defendant can offer a legitimate non-discriminatory reason for plaintiff's termination and the plaintiff cannot show that this reason is pretextual. Each of these arguments will be addressed in turn.

### B. Title VII Quid Pro Quo Sexual Harassment Claim

 *Quid pro quo* sexual harassment is based upon an employer's sexually discriminatory behavior that compels an employee to decide between acceding to sexual demands and forfeiting job benefits or suffering tangible job detriments. *Highlander v. KFC National Management Co.*, 805 F.2d 644, 648 (6th Cir.1986). The employee bears the burden of proof to support charges that submission to the sexual advances of a supervisor was an express or implied condition for receiving a job benefit or that the refusal to submit resulted in a tangible job detriment. *Id.*

 To establish a *prima facie* case of *quid pro quo* sexual harassment the plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment was based on sex; (4) that employee's submission to unwelcome advances was an express or implied condition of receiving job benefits or that employee's refusal to submit to supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of *respondeat superior* liability. *Id.* at 648.

■ In this case, the plaintiff does not allege that any job benefits were conditioned on acceptance of advances by Hooper, so her *prima facie* case depends on her ability to show that her refusal to submit to sexual advances or sexual demands from Hooper resulted in a tangible job detriment. The defendant moved for summary judgment on the ground that Ms. Reed cannot show any tangible job detriment; the defendant does not challenge the other elements of the plaintiff's *prima facie* case. (Docket No. 43 at 8)

As is discussed more thoroughly in Part II.E., *infra*, the court finds it reasonable to separate the sexual harassment and retaliation claims chronologically. The plaintiff has admitted that no sexual conduct or comments took place after she confronted Mr. Hooper in late October 1997. (Docket No. 47, para. 36) Similarly, the plaintiff admitted in her deposition that no retaliatory actions regarding her schedule or work assignments occurred prior to this confrontation. (Docket No. 40(1), Dep. Laurie Reed at 119, 141–42, 149) The plaintiff alleges the tangible employment actions taken against her included "changing [her] schedule, varying her hours to extremes, making her close, giving her bad sections, and finally terminating her for a trumped up reason." (Docket No. 46 at 16–17) All of these actions took place after October 1997 and are the factual basis for the plaintiff's retaliation claim. They do not apply to her claim of *quid pro quo* sexual harassment because they did not occur until after the sexual harassment had stopped. Therefore, the plaintiff does not allege any tangible employment actions that took place prior to October 1997, and the plaintiff cannot make out a *prima facie* case of *quid pro quo* sexual harassment.

The defendant's motion for summary judgment on the plaintiff's claim of *quid pro quo* sexual harassment under Title VII will be granted.

### C. Title VII Hostile Work Environment Sexual Harassment Claim

■ The plaintiff also alleges that she was subjected to hostile environment sexual harassment as a result of the comments and actions of Mr. Hooper that went unchecked during her employment at the Crossville Cracker Barrel. In *Meritor v. Vinson*, the Supreme Court recognized that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). For workplace harassment to be actionable, "it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.*, at 67, 106 S.Ct. at 2405 (internal citations omitted).

■ In order to establish a *prima facie* case of hostile environment sexual harassment, the plaintiff must assert and prove that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with her work performance and creating an intimidating, hostile, or offensive working environment that affected seriously her psychological well-being; and (5) the existence of respondeat superior liability. *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 619–20 (6th Cir. 1986); *Sconce v. Tandy Corp.*, 9 F.Supp.2d 773, 776 n. 5 (W.D.Ky.1998); *see also Williams v. General Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir.1999).

The plaintiff has clearly met her burden on the first three elements of her *prima facie* case. Ms. Reed is a member of a protected class. The alleged conduct and comments of Mr. Hooper, occurring almost continuously from early Summer 1996 through October 1997 were clearly of a sexual nature. And all of these actions and comments were based upon sex. They often concerned sexual acts and sexual desire, and there is no evidence in the record

that Mr. Hooper treated male employees similarly.

■ In order to establish the fourth element of her *prima facie* claim, the plaintiff must show that the harassing behavior was (1) severe and pervasive and (2) both objectively and subjectively offensive. In reviewing her claim on this basis, the court looks to the totality of the circumstances. *See Faragher*, 524 U.S. at 787, 118 S.Ct. at 2283; *Williams*, 187 F.3d at 562. Among other indicators, the court will consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787–88, 118 S.Ct. at 2283.

In *Abeita v. TransAmerica Mailings, Inc.*, the Sixth Circuit considered evidence that the plaintiff's immediate supervisor made "specific sexual and derogatory gender-based remarks ... and sexual comments throughout her entire term of work." 159 F.3d 246, 248 (1998). Although the plaintiff recounted only a limited number of specific comments, the court found that her "assertion that comments like these were commonplace, ongoing, and continual establishes that the statements were more pervasive or widespread" than indicated by the enumerated instances. *Id.* at 252; *see also Burnett v. Tyco Corp.*, 203 F.3d 980, 984 (6th Cir.2000) (applying the "commonplace, ongoing, or continuing" factor). "Plaintiff's inability to recount any more specific instances goes to the weight of her testimony, a matter for the finder of facts." *Id.* In addition, the court found that the fact that the alleged harasser was the president of the company and he and the plaintiff worked together on a daily basis could contribute to a finding that the conduct was severe and pervasive. Finally, the Sixth Circuit has found that allegedly harassing conduct that involves an element of physical invasion is more likely to be considered severe. *See Burnett*, 203 F.3d at 984; *Williams*, 187 F.3d at 563.

In the instant case, Mr. Hooper's comments and actions, if proven, clearly constitute severe and pervasive sexual harassment. Ms. Reed testified in her deposition that the comments occurred with increasing frequency, often involving discussions of Mr. Hooper's sex life or the plaintiff's body. She repeatedly stated that the specific allegations she has recounted are only a portion of what occurred. The comments alone would be sufficient to constitute severe and pervasive sexual harassment, but the plaintiff has also recounted several incidents where Mr. Hooper's conduct involved at least an element of physical invasion.

It is also clear from the evidence presented that Ms. Reed has established that Mr. Hooper's conduct was both objectively and subjectively offensive. Any reasonable person would find it offensive to work with a supervisor who daily crossed the line between the professional and the personal. The nature of Mr. Hooper's alleged comments and actions both to the plaintiff and in her presence, created an objectively hostile environment.

■ Ms. Reed also provides evidence that Mr. Hooper's conduct was actually offensive to her personally and directly affected her working environment. The Sixth Circuit has found that, in making this determination, a court should focus on " 'whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance.' " *Williams*, 187 F.3d at 567 (quoting *Harris*, 510 U.S. at 25, 114 S.Ct. at 367). "To show such interference, 'the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. The employee need only show that the harassment made it more difficult to do the job.' " *Id.* (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir.1988)).

In her deposition, Ms. Reed offered a number of different ways in which Mr. Hooper's conduct affected her. She testified that his comments gave her the "chills" and the "willies," (Docket No.

40(1), Dep. Laurie Reed at 111) and that she attempted to avoid Mr. Hooper at work. *Id.* at 119. Ms. Reed testified that after the incident at the salad bar cabinets she began crying and had to go to the employee bathroom to calm down before she could return to work. *Id.* at 112–16. She stated that she "cried a lot at the restaurant," *id.* at 140, and that her "tips decreased because [she] wasn't as happy of a person" because Mr. Hooper was "emotionally tormenting" her. *Id.* at 210–11. She has also stated that she often suffered from nausea and had trouble sleeping. *Id.* at 251–253. She told him in late October 1997, "This has to stop. I don't like it when you talk to me like this. This is not work—I can't work like this. I can't be like this." *Id.* at 139. This evidence is sufficient to show that the plaintiff found Mr. Hooper's conduct subjectively offensive and that it did have an effect on her ability to perform her job properly.

Considering the totality of the circumstances, the court finds that Ms. Reed has presented sufficient evidence that her work environment was hostile and offensive and that it unreasonably interfered with her work performance. The nature and the frequency of the alleged incidents amounted to severe and pervasive sexual harassment that was both objectively and subjectively offensive.

■ The remaining element of the plaintiff's *prima facie* case is to establish that the defendant is subject to respondeat superior liability. This determination also involves consideration of the defendant's assertion of the *Burlington Industries* affirmative defense. *See* 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). For the purposes of this motion, the defendant has admitted that Hooper worked as one of the plaintiff's supervisors at the Crossville Cracker Barrel and had the authority both to discipline and to terminate her. (Docket No. 47, paras. 56, 58–9; Docket No. 52) For the purposes of her *prima facie* case, then, the plaintiff has shown that Mr. Hooper is her supervisor, so there is employer liability for his ac-

tions. The defendant, however, claims that it is entitled to judgment as a matter of law because it is only vicariously liable for Mr. Hooper's sexual harassment and because it may assert an affirmative defense to that liability.

■ In *Williams*, the Sixth Circuit reviewed the standards set out by the Supreme Court in *Burlington Industries* and found that "employers now have an affirmative duty to prevent sexual harassment by supervisors." 187 F.3d at 561. The legal standard for the employer's liability turns on whether or not the sexual harassment culminated in a tangible employment action. *See Faragher*, 524 U.S. at 807–08, 118 S.Ct. at 2292–93. Under the *Burlington Industries* rule, "[i]f a plaintiff can prove a tangible employment action, liability is automatic; if however, there was no tangible employment action, employers have an affirmative defense to liability." *Williams*, 187 F.3d at 561 n. 2 (citing *Faragher*, 524 U.S. at 806–07, 118 S.Ct. at 2292–93; *Burlington Industries*, 524 U.S. at 764–65, 118 S.Ct. at 2270).

In this case, there are two separate claims—one for sexual harassment and one for retaliation—and a clear demarcation in the conduct that supports each claim. The hostile environment claim encompasses events prior to late October 1997, and the retaliation claim concerns events that occurred thereafter. The plaintiff has not alleged and cannot show that she suffered a tangible job detriment prior to her demand that Mr. Hooper stop his harassing conduct in late October 1997. Therefore, the defendant is entitled to raise the affirmative defense from *Burlington Industries*.

■ This affirmative defense to vicarious liability consists of two elements: (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided· by the

employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2293; *Burlington Industries,* 524 U.S. at 765, 118 S.Ct. at 2270.

The defendant asserts that it satisfies the first element of this defense because Cracker Barrel had an "officially promulgated policy against sexual harassment" in place at the time of these events and because the "Rules of Conduct prohibit[ ] employees from engaging in any conduct 'which may constitute any form of discrimination or sexual harassment.' " (Docket No. 43 at 10) Cracker Barrel's harassment policy contains "clear guidelines requiring any complaints of harassment be reported immediately either to store management or directly to the home office," and both the plaintiff and Mr. Hooper, like all employees, "received this policy and signed acknowledgments to that effect." *Id.*

Cracker Barrel's official "Fraternization and Sexual Harassment" policy states the following regarding sexual harassment:

Sexual harassment in any form will not be tolerated. All employees are responsible for assuring that the Company is free from sexual harassment. Inappropriate or offensive sexual behavior in the workplace will not be tolerated. The Company will take affirmative steps to curtail any such conduct. Employees must avoid any action or conduct which could be viewed as sexual harassment, including:

1. Sexual advances of any nature;
2. Requests for sexual acts or favors;
3. Other verbal or physical conduct of a harassing nature.

Any employee who has a complaint of sexual harassment at work by anyone, including supervisors, co-workers, customers, or others must report the complaint to the Company. Employees may report such complaints to their immediate supervisor, the Loss Prevention Department or the Human Resources Department in the home office. All complaints will be investigated within ten days and kept strictly confidential. Confirmed cases of fraternization or sexual harassment will be regarded as gross misconduct and appropriate disciplinary action will be taken.

(Docket No. 40(1), Dep. Laurie Reed, attach. Ex. 5) Ms. Reed was provided with the Employee Handbook that contained this policy when she was in Orientation for her position at Cracker Barrel. (Docket No. 47, para. 3; Docket No. 40(1), Dep. Laurie Reed at 224) She stated that she did not read the entire handbook during Orientation but was asked to sign a card acknowledging both the receipt of the handbook and that she "[had] read, or will read, the handbook in its entirety and will be responsible for abiding by all policies and rules contained therein." (Docket No. 40(1), Dep. Laurie Reed at 224; *id.,* attach. Ex. 2)

Where the absence of a harassment policy will not, as a matter of law, prevent a defendant from raising this defense, the existence of a policy is not determinative, as a matter of law, that an employer has met the reasonable care standard. Instead, the jury must determine whether the policy was being implemented and, if so, whether it was a reasonable and effective means of meeting the employer's duty to prevent and to correct sexual harassment. If the jury believes Ms. Reed's testimony that she spoke to two assistant managers and wrote a letter concerning Mr. Hooper's behavior and saw no results from those actions, then the jury could find that the defendant did not act reasonably to prevent or to correct sexual harassment. Similarly, if the jury finds that the defendant was aware of Mr. Hooper's conduct, either through other complaints or through the observations of other members of the Crossville management, then it could find that the defendant was not acting reasonably to prevent sexual harassment. The reasonableness of the defendant's conduct in this case must be left to the finder of fact.

Similarly, the second element of the defendant's affirmative defense depends on the jury's determination of the plaintiff's

actions concerning Mr. Hooper's conduct. If she "failed to fulfill the corresponding obligation of reasonable care to avoid harm," that may "suffice to satisfy the employer's burden under the second element of the defense." 524 U.S. at 765, 118 S.Ct. at 2270. The defendant relies on three principal arguments: (1) the plaintiff did not report the harassment for more than a year after it first occurred; (2) the plaintiff's statements to Ms. O'Rourke and Ms. Golliher were, at best, comments "in passing" and not "a 'complaint' per se;" and (3) there is no evidence that the plaintiff ever sent a letter to the home office complaining about Mr. Hooper's conduct. (Docket No. 43 at 10–12)

Clearly the first two arguments may be considered by the jury in making a determination of whether the plaintiff acted reasonably, but they do not constitute a complete "failure to use any complaint procedure." Likewise, the existence or non-existence of the plaintiff's letter is a matter for the jury to determine. Even if the jury finds that Ms. Reed did not report the harassment at all, that finding alone would not satisfy the second element of the defendant's affirmative defense because her failure must also be found to be unreasonable. In *Williams,* the Sixth Circuit considered the fact that the plaintiff had not reported the harassment in conjunction with the subjective requirement of the plaintiff's *prima facie* case. *See* 187 F.3d at 566. The court found that

> [a] plaintiff can be subjected to sexual harassment sufficiently severe or pervasive as to constitute a hostile environment and yet, for a number of valid reasons, not report the harassment. Williams's reluctance to report the incidents is entirely understandable considering that one of the alleged aggressors was her supervisor and she wanted to get along at work.

*Id.* These are all factors a jury may consider in deciding whether the defendant proved that Ms. Reed unreasonably failed to take advantage of any preventive or corrective procedures, but summary judg-

ment on this element would be inappropriate.

The plaintiff has put forth sufficient evidence to establish a *prima facie* case of hostile environment sexual harassment. Because the court finds that the hostile environment did not result in a tangible job detriment to the plaintiff, the defendant is entitled to raise the affirmative defense established in *Burlington Industries.* The defendant has not established, however, that it is entitled to judgment as a matter of law on the basis of the affirmative defense. This defense requires two separate inquiries into the reasonableness of the parties' behavior, a matter that must be left to a jury. In addition, the plaintiff has raised genuine issues of material fact regarding her complaints to Ms. O'Rourke and Ms. Golliher and regarding her letter to the home office recounting Mr. Hooper's conduct. Therefore, the defendant's motion for summary judgment on the plaintiff's Title VII hostile environment sexual harassment claim will be denied.

#### D. *Retaliation*

The defendant argues that the plaintiff cannot establish a *prima facie* case of retaliation under Title VII. Even if the court finds that the plaintiff has established all the elements of her *prima facie* case, the defendant argues that it is entitled to judgment as a matter of law because it has asserted a legitimate business reason for terminating Ms. Reed's employment and Ms. Reed has not presented sufficient evidence that this reason is pretextual.

■ A claim of retaliation under Title VII is generally evaluated under the *McDonnell Douglas* burden-shifting analysis of indirect evidence. *See EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 862 (6th Cir.1997). There are three stages of proof in this indirect approach to proving discrimination:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds

in proving the prima facie case, the burden [of production] shifts to the defendants 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In *St. Mary's Honor Center v. Hicks,* the Supreme Court clarified this standard by requiring plaintiffs to prove not only that the defendant's articulated reason is a pretext, but also that the real reason for the defendant's action was discriminatory. 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993).

In order to establish a *prima facie* claim of retaliation, the plaintiff must show that: (1) she engaged in an activity protected under Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999) (citing *Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1066 (6th Cir.1990)). The Sixth Circuit has found that "[t]here must be a lower burden of proof to sustain a *prima facie* case than to win a judgment on the ultimate issue." *Avery Dennison Corp.,* 104 F.3d at 861; *see also Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 377 (6th Cir.1984) ("Plaintiff's burden with respect to establishing a prima facie case [of retaliation] is not onerous.").

The defendant challenges the plaintiff's *prima facie* case on the grounds that she did not suffer any adverse employment action and that she cannot prove any causal connection between her opposition to sexual harassment and her termination. Before moving to those elements,

the court notes that the plaintiff has met the burden of proving the first two elements of the *prima facie* case of retaliation. She alleges that she complained to both Ms. O'Rourke and Ms. Golliher and wrote a letter to the home office complaining of Mr. Hooper's conduct. Even more clearly, Ms. Reed told Mr. Hooper directly that he must 'stop sexually harassing her. As one court has noted, a plaintiff who tells her immediate supervisor that he must stop sexually harassing her, is "engag[ing] in the most basic form of protected conduct; namely, telling a harasser, who was also serving as her supervisor, to cease all forms of physical and verbal harassment." *Quarles v. McDuffie County,* 949 F.Supp. 846, 853 (S.D.Ga.1996). The Sixth Circuit has also found that internal complaints are a form of protected activity. *See, e.g., Holden v. Owens–Illinois, Inc.,* 793 F.2d 745, 750 (6th Cir.1986). Since all of Ms. Reed's complaints were internal and directed to Cracker Barrel management, she has also provided sufficient evidence that the defendant was actually or constructively aware of the plaintiff's protected activity.

In order to meet the third element of her *prima facie* case, the plaintiff must show that she suffered some adverse employment action after complaining about the sexual harassment. An "adverse employment action" is defined as:

[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir.1999) (adopting standard verbatim from *Crady v. Liberty Nat'l Bank & Trust*

*Co.*, 993 F.2d 132, 136 (7th Cir.1993)); *see also Jackson v. City of Columbus*, 194 F.3d 737, 752 (6th Cir.1999) (listing as examples of adverse employment action: "a termination of employment, a change in salary, demotion, loss of benefits, decreased work hours, or significantly diminished material responsibilities"); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 886 (6th Cir.1996) (adopting *Crady* language in a claim under the Americans with Disabilities Act). In addition, "[t]he Sixth Circuit has consistently held that de minimis employment actions are not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir.2000).

In this case, the plaintiff alleges that she suffered adverse employment actions from the time she complained to Mr. Hooper in late October 1997 up to and including her termination in January 1998. The defendant concedes that the plaintiff's termination "admittedly could constitute an adverse employment action." (Docket No. 43 at 17) The plaintiff also alleges a number of other actions that constitute adverse employment actions.

Ms. Reed's position as a server in a restaurant does not offer many opportunities for demotion, change in benefits, or decreased material responsibilities. Instead, the court must take the level of action implied by that standard and examine these events for "other indices that might be unique to [this] particular situation." *Hollins*, 188 F.3d at 662. In this case, the plaintiff was required to work longer shifts, to stay beyond her scheduled shift, and to work until closing on a regular basis. Although it is difficult to imagine what a demotion or a decrease in responsibilities would involve with a server, these actions do constitute significant, negative changes in the plaintiff's work status. In addition, she suffered the economic detriment of being placed in the least desirable section of the restaurant on a regular basis. In a profession where wage is determined almost solely by tips, the consistent decision to place the plaintiff in a section with fewer customers than any-

where else in the restaurant amounted to a decreased wage. When taken together, the plaintiff has presented sufficient evidence to show that she suffered an adverse employment action, even prior to her termination.

■ The fourth and final element of the plaintiff's *prima facie* case of retaliation is the causal connection between her protected activity—complaints to Hooper and to managers of the Crossville Cracker Barrel and a letter to the home office—and the adverse employment actions—the schedule and assignment changes and her termination. The plaintiff has introduced evidence that no significant changes in her scheduling or section assignments occurred until she told Mr. Hooper to stop his harassing conduct and complained of his conduct to other assistant managers and to the home office. The plaintiff also shows that the retaliatory actions were taken by Mr. Hooper, who was the alleged harasser, and Mr. Hooper's own statements support the finding of a causal connection. Mr. Hooper's alleged animus toward the plaintiff, shown through his statements to her and to others about her, supports the inference that the changes to her work schedule and assignments were connected to her complaints about his behavior toward her.

The same connection can be found in relation to the plaintiff's termination. The plaintiff claims that she was never questioned about the incident that led to her termination. In addition, the termination form was filled out and signed by Mr. Hooper, and the defendant seems to have relied almost solely on Mr. Hooper's version of the events as the basis for terminating the plaintiff. In *Jackson v. RKO Bottlers of Toledo, Inc.*, the Sixth Circuit considered the lack of a thorough investigation of the triggering incident as evidence of a causal connection between the protected activity and the termination. *See* 743 F.2d at 377.

The Seventh Circuit considered a similar claim of retaliation, involving an alleged

harasser who was also a supervisor. *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446 (7th Cir.1994). The Seventh Circuit found that there was sufficient evidence of a causal connection to overcome a motion for summary judgment where the alleged harasser was involved in the decision to terminate the complaining employee:

> Our conclusion also is influenced by Chernoff's [the supervisor-harasser] participation in the decision to terminate Dey's employment, even if Irsay steadfastly maintains that the final decision was his alone .... Irsay solicited Chernoff's views on Dey's performance, and Chernoff agreed that it was unsatisfactory and that Dey should be replaced. Thus, even if Chernoff kept Dey's sexual harassment complaints to himself, those complaints may have affected Chernoff's unflattering assessment of her job performance. ***Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action.***

*Id.* at 1459 (emphasis added).

At a minimum, this evidence satisfies the plaintiff's burden of showing a causal connection between her complaints about Mr. Hooper's harassment, both to Mr. Hooper personally and to the defendant, and the actions by Mr. Hooper and the defendant against the plaintiff, up to and including her termination.

■■■■ Based on the evidence presented to the court, the plaintiff has met the burden of establishing a *prima facie* case of retaliation by Mr. Hooper and by the defendant. Once the plaintiff has made a *prima facie* case of retaliation, "the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Wrenn v. Gould*, 808 F.2d 493 (6th Cir.1987)). If the defendant produces such evidence, then the plaintiff must be given the opportunity to demonstrate "that the proffered reason was not the true reason for the employment decision." *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Canitia*, 903 F.2d at 1066.

The defendant has offered no legitimate, nondiscriminatory reason for the adverse employment actions taken against Ms. Reed by Mr. Hooper prior to her termination. The defendant challenges only the plaintiff's ability to establish a *prima facie* case of retaliation based on these actions. Because the court finds that the plaintiff has satisfied the elements of a *prima facie* case of retaliation with regard to the scheduling, assignment, and work conditions imposed by Mr. Hooper in Fall 1997, the defendant's motion for summary judgment, as it relates to these claims of retaliation, will be denied.

The defendant has clearly met its burden in this case with regard to the plaintiff's termination. The defendant has produced evidence that the plaintiff, in deciding not to charge a customer for two beverages and in not admitting this decision when first approached by Mr. Hooper, violated company policies. These policies were provided to the plaintiff in an Employee Awareness Form, which she signed on February 19, 1996, at the beginning of her employment. (Docket No. 40(1), Dep. Laurie Reed, attach. Ex. 4) The Form also states that Cracker Barrel may terminate the plaintiff's employment at any time, for violation of these policies or without cause, without notice. *See id.* Ms. Reed's termination notice, completed and signed by Mr. Hooper, stated that these actions were the basis for her termination. (Docket No. 40(1), Dep. Laurie Reed, attach. Ex. 12) This evidence satisfies the defendant's burden with regard to Ms. Reed's termination.

■■■■ The burden of production is thus returned to the plaintiff to show that the

defendant's decision to terminate her was based on retaliatory reasons and that the defendant's proffered legitimate reason is merely pretextual. In meeting this burden, the plaintiff may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. In *Manzer v. Diamond Shamrock Chem. Co.*, the Sixth Circuit found:

> To make a submissible case on the credibility of his employer's explanation, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.

29 F.3d 1078, 1084 (1994) (internal citations omitted).

 In this case, the plaintiff has provided evidence that servers frequently provided free drinks or salads or desserts to dissatisfied customers, with or without the prior approval of the manager on duty. Although the defendant alleges that the manager is required to provide approval for such decisions, the deposition testimony provided by the defendant indicates that this policy was not strictly enforced. (Docket No. 40(6), Deposition of Anna Jolan Hartley at 9–11) There is evidence that servers would often inform a manager after the fact, and would sometimes not inform a manager at all. *Id.;* Docket No. 46, attach. Ex. 8, Dep. Katherine O'Rourke at 27–29. In either case, the employee may have been subject to discipline, but was not terminated. (Docket No. 40(6), Dep. Anna Jolan Hartley at 9–11; Docket No. 46, attach. Ex. 8, Dep. Katherine O'Rourke at 29; Docket No. 46, attach. Ex. 4, Deposition of Garry Garrison at 63–64)

In addition, the plaintiff has provided evidence that the entire investigation of the incident, which appears to have been limited to questioning the cashier on duty, was conducted by Mr. Hooper. (Docket No. 46, attach. Ex. 4, Dep. Garry Garrison at 25) Mr. Hooper completed and signed the termination papers. Mr. Miller, who apparently decided that termination was appropriate, relied on Mr. Hooper's account of the events of January 4, 1998. Mr. Garrison, who ultimately approved the termination, stated in his deposition that he relied on the account given by Mr. Miller. Mr. Garrison "told him to review it, and if the facts were the same, go ahead and terminate." *Id.* at 23. There is no evidence that a review of the facts took place. Instead, the management relied on the information provided by Mr. Hooper and never asked the plaintiff for her version of the events. In fact, Mr. Garrison indicated in his deposition that he was unaware of the guest's complaint about his food. *Id.* at 63. Mr. Garrison stated that, if he had known, his recommendation to Mr. Miller approving termination would have been different. *Id.* at 63–64. The defendant admits that Mr. Hooper had the authority to discipline and to terminate the plaintiff's employment. (Docket No. 47, paras. 58–59; Docket No. 52) Although the defendant claims that the decision came solely from Mr. Miller and without a recommendation by Mr. Hooper, the plaintiff has provided sufficient evidence that Mr. Hooper played an active role in the decision to terminate her employment.

The evidence provided by the plaintiff is sufficient to challenge whether the defendant's proffered explanation was the actual motivation behind her termination. In a recent decision, the Supreme Court reiterated that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000). The Court quoted the *St. Mary's Honor Center* decision that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is ac-

companied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Id.* (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). A reasonable jury could find that the defendant's explanation in this case is not credible. That determination, considered with the plaintiff's *prima facie* case, could support a finding that the defendant retaliated against the plaintiff for her actions to stop the harassment.

▪ The plaintiff has established a *prima facie* case of retaliation by the defendant for actions taken against her in Fall 1997 leading up to, and including, her termination in January 1998. The defendant has offered a legitimate, nondiscriminatory reason for the termination, but the plaintiff has provided sufficient evidence that this proffered reason is pretextual and that the defendant's actual motivation was retaliatory. Therefore, the defendant's motion for summary judgment on the claim of retaliation will be denied.

### E. Statute of Limitations Regarding State Law Claims

▪ In addition to her federal claims under Title VII, the plaintiff has filed identical claims for sexual harassment and retaliation under the Tennessee Human Rights Act. TENN. CODE ANN. § 4–21–101 *et seq.* (1998). Under T.C.A. § 4–21–311(d), any civil cause of action under the Tennessee Human Rights Act must be filed "within one (1) year after the alleged discriminatory practice ceases." The plaintiff admits that any conduct of a sexual nature by Mr. Hooper ended in late October 1997 when she confronted him and demanded that he stop. (Docket No. 47,

para. 36) The plaintiff was terminated from her employment on January 8, 1998. *Id.,* para. 12.[5] She filed a claim with the EEOC and with the Tennessee Human Rights Commission on July 18, 1998. *Id.,* para. 13. She received a right to sue letter from the EEOC dated January 7, 1999, and she filed this suit on January 8, 1999.[6]

▪ In *Spicer v. Beaman Bottling Co.,* the Tennessee Supreme Court recognized the "continuing violation doctrine" in discrimination cases. 937 S.W.2d 884 (Tenn.1996). This doctrine "allows a plaintiff to challenge an ongoing, continuous series of discriminatory acts in their entirety as long as one of those discriminatory acts falls within the limitations period." *Id.* at 886. There are three factors for the court to consider "in determining whether the discriminatory conduct amounts to a continuing violation or whether it is merely discrete, isolated, and completed acts which are individual violations." *Id.* at 890. These three factors were suggested by federal courts and adopted by the *Spicer* court:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse con-

---

5. The defendant apparently contests this date of termination. (Docket No. 46, attach. Ex. 1, para. 9) The court finds that this is the date on which Ms. Reed received and signed her notice of termination, thus it is the date of termination for the purposes of this lawsuit.

6. Again, the defendant seems to contest this date, and the papers are, admittedly, some-

what unclear. However, the summons was dated January 8, 1999, and the record reflects that this is the date on which the suit was filed. For whatever administrative reason, some of the plaintiff's initial complaint papers are dated the following Monday, January 11, 1999. The defendant admits that its copy was dated January 8, and this court will find in favor of the plaintiff on this matter.

sequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.* (quoting *Berry v. Board of Supervisors of L.S.U.,* 715 F.2d 971, 981 (5th Cir.1983)).

In considering the instant case, the court must examine the sexual harassment and retaliation claims separately. The plaintiff admits that all conduct of a sexual nature ended in late October 1997 when she confronted Mr. Hooper. That is also the point at which the retaliatory conduct began, which culminated in the plaintiff's termination in January 1998. The plaintiff filed her suit in January 1999, so for the sexual harassment claim to be within the statute of limitations under the continuing violation doctrine, there must have been some act of sexual harassment within one year prior to January 8, 1999. The date of the plaintiff's termination was January 8, 1998, so the termination must have been some part of the continuing sexual harassment in order for this claim to be valid.

Both the Sixth Circuit and the Tennessee Supreme Court have recognized that sexual harassment may include acts of a non-sexual nature. *See Williams,* 187 F.3d at 564–66; *Spicer,* 937 S.W.2d at 888. At the same time, the *Spicer* court distinguished between sexual harassment, which the plaintiff conceded ended more than a year before she filed suit, and actions by the harasser which the plaintiff called "mad and cold." *Spicer,* 937 S.W.2d at 887. The court found that since the sexual conduct ended more than a year before the plaintiff had filed suit, the sexual harassment claim was barred by the statute of limitations. *See id.* at 890. The court found that the "mad and cold" acts were not part of the same type of discrimination because the plaintiff was unable to show that the violations of company policy that she committed—and which were the basis of her termination—"resulted from discriminatory behavior on the part of her employer." *Id.* at 890–91. The plaintiff had filed a separate charge of retaliation, but she voluntarily dismissed that claim after the jury was unable to reach a verdict on it. *See id.* at 887, 891 n. 7.

In this case, there are separate claims of sexual harassment and retaliation, and there seems to be a clear demarcation where the former ended and the latter began. For that reason, the court has examined the sexual harassment claims as terminating with the plaintiff's confrontation of Mr. Hooper in late October 1997. Given that approach, the plaintiff has not shown that any acts of sexual harassment occurred within one year prior to January 8, 1999. As a result, the plaintiff's state law claims for *quid pro quo* and hostile environment sexual harassment under the Tennessee Human Rights Act are barred by the statute of limitations.

■■■ The plaintiff's claim of retaliation, however, does fall within the limits of the continuing violation doctrine. The plaintiff has shown that the acts by Mr. Hooper after their confrontation in late October 1997, leading up to and including her termination on January 8, 1998, involved the same type of discrimination. The retaliatory acts were recurring, occurring every time Mr. Hooper scheduled the plaintiff or worked with the plaintiff. Finally, although the plaintiff claims to have complained about Mr. Hooper's retaliatory conduct prior to her termination, it is the termination that triggered her awareness of her duty to assert her rights. Prior to that point, the plaintiff was apparently attempting to work "within the system" established by Cracker Barrel while maintaining her employment. The court finds that the retaliation claim, therefore, is within the statute of limitations because one act within the continuing violation of retaliating against the plaintiff occurred within one year prior to the filing of the instant suit.

The defendant's motion for summary judgment on the state claims will be granted as to the sexual harassment claim and denied as to the retaliation claim.

The Tennessee Supreme Court has recognized that "[a]lthough the language differs slightly, it is clear that the legislature intended the THRA to be coextensive with

federal law .... We, therefore may look to federal interpretation of Title VII for guidance in enforcing our own anti-discrimination statute. We, however, are neither bound by nor limited by federal law when interpreting the THRA." *Phillips v. Interstate Hotels Corp. # L07,* 974 S.W.2d 680, 683–84 (Tenn.1998) (internal citations omitted). Tennessee appellate courts have further recognized that a *prima facie* claim of retaliation involves proving the same elements whether it is brought under the THRA or Title VII. *See Austin v. Shelby Co. Government,* 3 S.W.3d 474, 480 (Tenn. Ct.App.1999); *Newsom v. Textron Aerostructures,* 924 S.W.2d 87, 96 (Tenn.Ct.App. 1995). The Tennessee courts have also followed the rest of the *McDonnell Douglas* burden-shifting framework in analyzing retaliation claims under the THRA. *See Newsom,* 924 S.W.2d at 96. As a result, the analysis of the defendant's motion for summary judgment on the merits of the Title VII retaliation claim applies equally to the state retaliation claim and, therefore, will be denied.

### III. CONCLUSION

The plaintiff has established a *prima facie* case of hostile environment sexual harassment and of retaliation under Title VII. In addition, the plaintiff has established a *prima facie* claim of retaliation under the Tennessee Human Rights Act. Although the defendant has produced evidence of a legitimate, non-discriminatory reason for terminating the plaintiff's employment, the plaintiff has produced sufficient evidence of pretext to overcome the defendant's motion for summary judgment and to create a genuine issue of fact regarding the defendant's motivation for the termination. Therefore, the defendant's motion for summary judgment as to these claims will be denied.

The plaintiff has not established a *prima facie* claim of *quid pro quo* sexual harassment under Title VII. In addition, the plaintiff's claims of *quid pro quo* and hostile environment sexual harassment under the Tennessee Human Rights Act are barred by the statute of limitations.

Therefore the defendant's motion for summary judgment on these claims will be granted.

An appropriate Order will enter.